**Jerald SKLAR**

v.

**Joseph RYAN, et al.**

**Civ. A. No. 89–4541.**

United States District Court,
E.D. Pennsylvania.

Nov. 29, 1990.

---

Petitioner was represented by J. Michael Farrell, Esquire, and the Philadelphia District Attorney's office was represented by Elizabeth J. Chambers, Esquire, and Marilyn F. Murray, Esquire.

## ORDER

NEWCOMER, District Judge.

AND NOW, this 29th day of November, 1990, after careful and independent consideration of the petition for writ of habeas corpus, the Report and Recommendation of United States Magistrate Peter B. Scuderi, and petitioner's objections to the Magistrate's Report, it is hereby Ordered that:

1. The Magistrate's Report and Recommendation filed is APPROVED and ADOPTED.

2. The petition for writ of habeas corpus is DENIED.

3. There *is* probable cause for appeal.

AND IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

PETER B. SCUDERI, United States Magistrate.

This is a counseled petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by a person presently confined at the State Correctional Institute at Dallas, Pennsylvania. For the following reasons I recommend that the writ be denied.

*FACTS AND PROCEDURAL HISTORY:*

On March 15, 1978, petitioner was convicted by a jury of first degree murder for the 1972 killing of Edward Rauer before the Honorable Theodore B. Smith, Jr., of the Philadelphia Court of Common Pleas. (Information No. 984, Court of Common Pleas of Philadelphia County, August Term, 1977). On April 8, 1978, he was again convicted by a jury of first degree murder for the killing of Abraham Fishman, a/k/a Al Fisher, also before Judge Smith. (Information No. 987, Court of Common Pleas, Philadelphia County, August Term, 1977). After post-verdict motions were denied, Judge Smith sentenced Sklar to two concurrent life sentences.

On direct appeal to the Pennsylvania Supreme Court, appeals from both convictions were consolidated and the judgments of sentence were affirmed. *Commonwealth v. Sklar*, 497 Pa. 404, 441 A.2d 1201 (1982). Sklar filed a petition under Pennsylvania's Post Conviction Hearing Act (PCHA), 42 Pa.Cons.Stat.Ann. § 9541, *et seq.* (Purdon 1982) (superceded), on January 20, 1987, which was dismissed by the Honorable Joseph D. O'Keefe, of the Philadelphia County Court of Common Pleas, on January 23, 1989.

In his habeas corpus petition filed on June 19, 1989, petitioner, through his counsel, claims:

1. His confessions and prosecutions were the result of prosecutorial misconduct in the form of a violation of a grant of immunity;

2. His inculpatory statements should have been suppressed due to an unreasonable period of questioning without arraignment;

3. His conviction was obtained by use of a confession involuntarily given under his subjective belief, based on advice of counsel, that federal promises of immunity and confidentiality prevented any use of the confessions against him;

4. His confessions were obtained through prosecutorial and police misconduct in that neither the police nor the prosecutor told him that his federal immunity had been withdrawn;

5. He was denied the right of confrontation in that his cross-examination of a newspaper reporter was improperly restricted;

6. His statements were improperly introduced into evidence at trial without independent proof of *corpus delicti;*

7. There was insufficient evidence to establish that petitioner's co-conspirator shot the victims, apart from petitioner's statements;

8. He received ineffective assistance of counsel in that:

a. Pre-trial counsel permitted petitioner to give an inculpatory statement to newspaper reporters;

b. Trial counsel failed to move to suppress petitioner's statements as fruits of a violation of a grant of immunity;

c. Trial counsel failed to object to admission of a tape of his confession to the Fishman murder;

d. Trial counsel failed to challenge the sufficiency of the evidence on the grounds that the Commonwealth did not prove that his co-conspirator committed the murder;

9. The trial court erred by:

a. Excluding a *res gestae* declaration;

b. Permitting the prosecutor to question the United States Attorney as to privileged matters;

c. Permitting the prosecutor to cross-examine petitioner as to why he waited until trial to deny that his police statements were true;

d. Failing to grant a mistrial when Assistant District Attorney Haines withheld a portion of the pre-trial police statement of a Commonwealth witness;

10. The prosecutor improperly asked a defense witness if he had attempted to make a "deal" to testify against petitioner;

11. The prosecutor improperly expressed in his closing argument his belief that petitioner's testimony was untrue.

Since these claims have been presented to the state's highest court, petitioner has exhausted state remedies as required by 28 U.S.C. § 2254(b). *Anderson v. Harless*, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Brown v. Cuyler*, 669 F.2d 155 (3rd Cir.1982). This court may, consistent with principles of comity, review the petition.[1]

DISCUSSION:

Petitioner's claims derive from a complicated series of events. On June 23, 1972, Edward Rauer was found dead from a gun-

shot wound in his taxicab. On March 5, 1973, Abraham Fishman, otherwise known as Al Fisher, was shot. He died of complications from the shooting on January 22, 1974. (N.T. 3/31/78, 355).

In the spring of 1976, Jerry Sklar approached the United States Attorney's office, through his lawyer, Daniel Preminger, Esquire, to obtain entrance into a federal witness protection program in return for information on alleged corruption within the Federal Bureau of Investigation. On June 29, 1976, United States Attorney J. Clayton Undercofler, III, wrote Mr. Preminger granting Sklar use immunity for any statements he made during interviews by federal agents. (N.T. 2/21/78, Ex. D–1 attached thereto). Sklar then met with federal agents and implicated himself as the middleman in both the Rauer and Fishman murders, alleging that he saw the man who ordered these murders successfully bribe a federal agent.

On October 12, 1976, United States Attorney David B. Marston wrote a letter to the Philadelphia District Attorney telling him that Jerald Sklar had given federal authorities information under a grant of immunity on these murders. He also notified that office that the federal promise of immunity to Sklar was being revoked because his disclosures were not entirely truthful. The letter included the name and telephone number of a federal agent who could provide the district attorney's office with further details of Sklar's statements to the FBI.[2]

Assistant District Attorney Clifford Haines received this information and requested the open files on the Rauer and Fishman murders from the Philadelphia Homicide Division on October 15, 1976, telling the division's captain that information had been received on those cases from fed-

---

1. Sklar's original counseled habeas corpus petition contained twenty-four grounds for constitutional error. Sklar also submitted several handwritten letters to the court which contained new accusations of error. Many of these claims were not properly presented to the Pennsylvania Supreme Court and were therefore not exhausted under 28 U.S.C. § 2254(b). However, in petitioner's response to the Commonwealth's answer to his petition, Sklar's attorney requested

leave to amend his petition to include only those claims which have been exhausted. This court has granted counsel's request and has so amended the petition.

2. This letter is not to be found in the record. However, the text of the letter is reprinted in *Commonwealth v. Sklar*, 497 Pa. 404, 441 A.2d 1201 (1982).

eral authorities. (N.T. 12/28/77, 5.94–5.-95). Detective Sergeant Edward Funk, in charge of unsolved crimes, was. notified that information had been received on the Rauer and Fishman files and he sent them to the district attorney's office. (N.T. 12/22/77, 2.149–2.150).

On October 15, 1976, Jerry Sklar's personal belongings were found by Detective Robert Bowdren, of Central Detective Division, inside an automobile which was reported stolen, including a picture of him with a Philadelphia police officer and a copy of the letter from United States Attorney Undercofler to him granting federal immunity. On October 17, 1976, Detective Bowdren interviewed the police officer who was pictured with Sklar and confirmed that petitioner had spoken to federal authorities under a grant of immunity. He also learned from this officer that Sklar claimed to have information on an unrelated homicide, that he may have had the permission of the auto's owner to operate the vehicle, and where petitioner could be found. (N.T. 12/22/77, 2.22, 2.117; 12/28/77, 5.6–5.11, 5.26–5.36)

Detective Bowdren with other Philadelphia police assisted in Sklar's arrest at 1:00 a.m. on October 18, 1976, in Bensalem, pursuant to a warrant for automobile theft. After waiving extradition, Sklar was taken to Philadelphia Homicide Division for questioning on the stolen car charge because Sklar had information on the unrelated homicide. (N.T. 12/28/77, 5.09–5.12).

Before and during interrogation at homicide in the early morning hours of October 18, 1976, Sklar briefly mentioned his federal immunity without stating any facts. (N.T. 12/28/77, 5.17, 5.19, 5.22, 5.34).[3] This reference to immunity was discussed among homicide personnel. Sergeant Funk heard of it and linked Sklar with the request for the unsolved Rauer and Fishman

cases. (N.T. 12/22/77, 2.50, 2.147, 2.150–51; 12/28/77, 5.32–5.35).

Sklar was questioned regarding the stolen automobile from the time he arrived at Homicide Division in Philadelphia until 5:00 a.m. that morning, less than one hour. (N.T. 12/28/77, 5.16–5.17). Detective Bowdren then left petitioner in an interrogation room, which they had been using at Homicide, for him to be questioned regarding the unrelated homicide. At this time Sklar was still in custody. Detective Bowdren did not charge Sklar at that time for the stolen car. (N.T. 12/28/77, 5.38–5.40).

After speaking to Detective Bowdren, Sklar asked to talk to a homicide detective. (N.T. 12/22/77, 2.54). From 5:30 a.m. to 7:30 a.m., after giving him *Miranda* warnings, Detective Harrison Thornhill from Philadelphia Homicide Division questioned Sklar regarding the unrelated murder. (N.T. 12/22/77, 2.61, 2.66). Sklar then agreed to take a polygraph examination on the information he had given the police. During this period petitioner was never restrained. (N.T. 12/22/77, 2.56–2.57, 2.68).

At approximately 7:30 a.m., October 18, 1976, Detective Sergeant Funk interrupted questioning of Sklar to confirm with him that the immunity to which Sklar referred involved the Rauer and Fishman murders. (N.T. 12/22/77, 2.49–2.51, 2.119–2.120, 2.148–2.151). Sergeant Funk then contacted the District Attorney's office to determine the extent of information they had on the open murder files. At around 10:00 a.m. that morning Funk went to the District Attorney's office, read the David Marston letter and spoke with an F.B.I. agent who told him that Sklar had implicated himself as the middleman in the two unsolved murders. (N.T. 12/22/77, 2.120–2.-

---

**3.** At the suppression hearing Detective Bowdren, who was the first police officer to interrogate Sklar, was very uncertain of the facts surrounding that time period. He didn't remember whether or not he had the grant of immunity letter, if he showed it to Sklar or if Sklar initiated the immunity conversation. However, he was certain that he had the information that Sklar had a grant of immunity from the federal government for some crime, that it was discussed, that Sklar admitted the grant of immunity and refused to answer any questions about it and that Detective Bowdren told someone else at homicide, most probably Sergeant Funk, about the immunity. (N.T. 12/28/77, 5.17, 5.21–5.22, 5.32–5.34).

121, 2.151–2.155).[4]

While this was occurring, homicide personnel were questioning Sklar regarding the unrelated homicide, confirming that he had permission to drive the allegedly stolen vehicle and questioning him further on an alleged burglary. Sklar was then polygraphed on the information which homicide had already obtained. (N.T. 12/22/77, 2.82, 2.103, 2.105).

Following the polygraph, at approximately 5:30 p.m., Sklar apparently felt he was not being taken seriously. He said to Detective Thornhill, "Listen, after all this time we have spent together, if you don't believe me, I know about a couple other murders I can tell you about." Sergeant Funk then questioned petitioner on the murders of Eddie Rauer and Abraham Fishman. (N.T. 12/22/77, 2.106–08).

Sergeant Funk told Sklar, before taking statements on these murders, that it was his opinion that federal immunity would not protect petitioner from state prosecution. He also gave petitioner *Miranda* warnings and received and recorded petitioner's waiver of these warnings. The statements which Sklar gave at this time were recorded in writing and signed by petitioner. These were not the statements used at petitioner's trial. (N.T. 12/22/77, 2.127, 2.154–55).

On the evening of October 18th, approximately 8:30 p.m., after the statements were taken, Sergeant Funk told Sklar that he was free to go and told two of his officers to take Sklar home or to wherever he wanted to go. However, petitioner could not find anyone who would take him in, so he slept on chairs at the police station. (N.T. 12/22/77, 2.131–34, 2.161).

When Sergeant Funk returned to work on the morning of October 19, 1976, and found Sklar was still at homicide, he assigned Detective Donald Lyons and Detective William O'Brien to take in-depth interviews of petitioner. (N.T. 12/22/77, 2.133). These statements were recorded on tape and later played at petitioner's trial for the jury. These statements were the foundation of the Commonwealth's evidence against Sklar. (N.T. 12/27/77, 4.15, 4.25–32).[5]

The circumstances surrounding the taking of Sklar's statements on the Rauer and Fishman murders on October 19th form the basis of many of petitioner's claims to this court. These claims are that:

1. His confessions and prosecutions were the result of prosecutorial misconduct in the form of a violation of a grant of immunity;

2. His confessions were obtained through prosecutorial and police misconduct in that neither the police nor the prosecutor told him that his federal immunity had been revoked;

3. He received ineffective assistance of counsel in that trial counsel failed to move to suppress petitioner's statements as fruits of a violation of a grant of immunity;

4. His inculpatory statements should have been suppressed due to an unreasonable period of questioning without arraignment;

5. His conviction was obtained by use of a confession involuntarily given under his subjective belief, based on advice of counsel, that federal promises of immunity and confidentiality prevented any use of the confessions against him.

## IMMUNITY

The United States Supreme Court in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), held that to compel testimony over a claim of the privilege against self-incrimination, "a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader." *Id.* at

---

**4.** At some unspecified later time, Assistant District Attorney Haines received from Assistant United States Attorney Robert N. deLuca a one and one-half page excerpt from the petitioner's statement to the federal agents. (N.T. 12/28/77, 5.99–5.100).

**5.** The record established that before Sklar made his statements to the police, these crimes were listed as unsolved and no evidence existed to link Jerald Sklar with the victims. (N.T. 12/22/77, 2.16–2.27).

453, 92 S.Ct. at 1661. The Court upheld the constitutionality of the federal immunity statute, 18 U.S.C. § 6002 (1976), which provides for use and derivative use immunity, finding that "such immunity ... is coextensive with the scope of the privilege against self-incrimination." 406 U.S. at 453, 92 S.Ct. at 1661. *See also, United States v. Frumento,* 552 F.2d 534 (3d Cir. 1977).

It is well recognized that once a defendant establishes he has testified under a grant of immunity, "the prosecution [has] the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* at 460, 92 S.Ct. at 1665. Thus, "immunity from use and derivative use 'leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege' in the absence of a grant of immunity." 406 U.S. at 458–59, 92 S.Ct. at 1664 (quoting *Murphy v. Waterfront Commission,* 378 U.S. 52, 79, n. 18, 84 S.Ct. 1594, 1609, n. 18, 12 L.Ed.2d 678 (1964)).

■ Except as a basis for a prosecution for perjury, a witness's immunized testimony may not be used against him in a later criminal trial. *United States v. Apfelbaum,* 445 U.S. 115, 131, 100 S.Ct. 948, 957, 63 L.Ed.2d 250 (1980); *New Jersey v. Portash,* 440 U.S. 450, 459–60, 99 S.Ct. 1292, 1297–98, 59 L.Ed.2d 501 (1979); *United States v. Frumento,* 552 F.2d at 543. It has long been held that immunity, when granted by the federal government, extends to criminal prosecutions in state proceedings. *Murphy,* 378 U.S. 52, 77–78, 84 S.Ct. 1594, 1608–09, 12 L.Ed.2d 678; *Ullman v. United States,* 350 U.S. 422, 435–36, 76 S.Ct. 497, 505–06, 100 L.Ed. 511 (1956); *Brown v. Walker,* 161 U.S. 591, 607–08, 16 S.Ct. 644, 650–51, 40 L.Ed. 819 (1896). *See also In re Grand Jury Proceedings,* 757 F.2d 1580, 1582–83 (5th Cir. 1985) (per curiam) (grant of federal immunity will protect witness in state prosecution); *Commonwealth v. Fattizzo,* 223 Pa. Super. 378, 299 A.2d 22 (1972) (federal prohibition on use and derivative use of testi-mony given under a grant of immunity applies to state criminal proceedings.)

■ Where a witness testifies under use and derivative use immunity, the government may still prosecute him using evidence from legitimate independent sources. *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1664. Once a defendant demonstrates that he has testified under a federal grant of immunity, to matters related to the state prosecution, the state prosecutors must show that their evidence is not tainted, by establishing that they had an independent, legitimate source for the disputed evidence. *Murphy v. Waterfront Commission,* 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 1604 n. 18, 12 L.Ed.2d 678. It is not enough to show that the evidence lacks any taint from the prior immune testimony, the state must show that the evidence it proposes to use is derived from a legitimate source wholly independent of the immune testimony. *Id.; Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1664.

There is no question that informal "letter" use and derivative use immunity implicates the provisions of *Kastigar* and is fully enforceable. *See, e.g., United States v. Palumbo,* 897 F.2d 245 (7th Cir.1990); *United States v. Williams,* 809 F.2d 1072, 1081–82 (5th Cir.), *on rehearing,* 817 F.2d 1136, 1138 (5th Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 228, 98 L.Ed.2d 187 (1987); *United States v. Society of Indep. Gasoline Marketers of Am.,* 624 F.2d 461, 469–74 (4th Cir.1979), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981); *United States v. Kurzer,* 534 F.2d 511, 513 (2d Cir.1976). *See also, United States v. Quartermain, Drax,* 613 F.2d 38, 40–41 (3d Cir.1980) (Adopting district court determination that informal letter immunity agreement with government lawyers granted use and derivative use immunity, coextensive with the privilege against self-incrimination). Thus, as it was stated in *Kastigar,* the state must show that the evidence used to convict petitioner was not obtained by "focusing investigation on a witness as a result of his compelled disclosure." 406 U.S. at 460, 92 S.Ct. at 1664;

*In re Grand Jury Proceedings,* 497 F.Supp. 979, 986 (E.D.Pa.1980).[6]

The determination of whether petitioner's conviction was obtained by use of immunized testimony or evidence derived therefrom is a mixed question of law and fact. *In re Grand Jury Proceedings,* 497 F.Supp. 979, 985 (E.D.Pa.1980). Petitioner first contends that both his prosecution and his confessions were the fruits of prosecutorial misconduct by an exchange of information between federal authorities and the Philadelphia police and District Attorney's office.

Therefore, the question before this court is whether a violation of petitioner's immunity grant rendered the verdict in his trial unreliable. This court must determine how much of the evidence used in Sklar's conviction was obtained by the Commonwealth from an independent legitimate source, *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1664, and whether this evidence alone was sufficient to support petitioner's convictions in each case of murder.[7]

Unlike the cases which have dealt with this issue, the government's grant of immunity to Sklar was impliedly limited. In the letter from United States Attorney J. Clayton Undercofler, III, to Daniel Preminger, Esquire, use immunity was granted for a period of time required by the government to evaluate whether Sklar's request for inclusion in the federal witness protection program was appropriate. The immunity was then expressly revoked on October 12, 1976, in a letter from United States Attorney David W. Marston to Philadelphia District Attorney F. Emmet Fitzpatrick, a copy of which was sent to Daniel Preminger, Esquire. (N.T. 2/21/78, Ex. D–1 attached thereto).

The fact that the federal government withdrew its offer of immunity cannot be construed as removing the original protection offered for Sklar's statements to the FBI before the immunity was revoked. In following *Kastigar,* those statements must be treated as if Sklar had invoked his Fifth Amendment privilege and never made them.[8] The withdrawal merely marked a

**6.** I dismiss here any argument that information which is volunteered by a witness, on condition that the informant would receive immunity, is distinguishable from information extracted through immunity following a claim of privilege against self-incrimination. Were I to hold that volunteered information is not "compelled" and does not receive the same legal protection, the grant of immunity which motivates the giving of this information would not be coextensive with the Fifth Amendment privilege and would thus be unconstitutional. *See Kastigar,* 406 U.S. at 461, 92 S.Ct. at 1665; *United States v. Pantone,* 634 F.2d 716, 719 (3d Cir.1980); *United States v. Frumento,* 522 F.2d 534, 544 (3d Cir. 1977). *But see Commonwealth v. Sklar,* 497 Pa. 404, 441 A.2d 1201, 1206 (1982).

**7.** It has recently been held that the strictures of use immunity are not so broad as to prevent prosecution where a government attorney or a witness merely has knowledge of the existence of immunized testimony or even limited knowledge of the contents of immunized testimony. *U.S. v. Mariani,* 851 F.2d 595, 600 (2d Cir.1988), *cert. denied,* 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989); *U.S. v. Poindexter,* 698 F.Supp. 300, 307 (D.D.C.1988). *But, see U.S. v. McDaniel,* 482 F.2d 305 (8th 1973) (Conviction vacated where prosecutor could not show sufficient independent evidence because he had read defendant's immunized testimony before trial, unaware that it was immunized.); *U.S. v. Kurzer,* 534 F.2d 511 (2d Cir.1976) (An impermissi-

ble nonevidentiary use was found when Kurzer was convicted on the testimony of a witness who decided to cooperate after being indicted in another matter on the basis of Kurzer's immunized testimony.)

**8.** The conclusion of the Pennsylvania Supreme Court, *Commonwealth v. Sklar,* 441 A.2d at 1206, that once a grant of immunity is frustrated by a witness giving untrue testimony, all statements given under that grant of immunity may be later used in a criminal prosecution for the crimes testified to is lacking any support in the law. *See U.S. v. Apfelbaum,* 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980) (use of testimony given under a grant of immunity is limited to use in a later prosecution for making false statements so long as that testimony conforms to otherwise applicable rules of evidence); 18 U.S.C. § 6002 (providing that no testimony or other information provided under an order to testify over a claim of a Fifth Amendment privilege may be used against the witness in any criminal case, "except a prosecution for perjury, giving false statement or otherwise failing to comply with the order.") *Id.* A witness's immunized testimony may not be used against him in a later criminal trial, except as a basis for prosecution for perjury. *United States v. Apfelbaum,* 445 U.S. 115, 131, 100 S.Ct. 948, 957, 63 L.Ed.2d 250 (1980); *New Jersey v. Portash,* 440 U.S. 450, 459–60, 99 S.Ct. 1292, 1297–98, 59 L.Ed.2d 501 (1979); *United States v. Frumento,* 552 F.2d at 543.

date, after which, any statements Sklar knowingly made to the federal government, could be used against him in a criminal prosecution.

However, it does not follow that any statements Sklar made to the Philadelphia police, after the date that the federal government withdrew its grant of immunity, could be used against petitioner in his trial. By notifying the Philadelphia County District Attorney's office that Sklar had implicated himself as a middleman in two local murders while testifying under a grant of immunity, the United States Attorney's office set in motion a chain of events that originated with the contents of an immunized statement. This was clearly an indirect, nonevidentiary use of the immunized statements as prohibited by the Third Circuit Court of Appeals. *See United States v. Semkiw,* 712 F.2d 891 (3d Cir. 1983); *United States v. Pantone,* 634 F.2d 716, 723 (3d Cir.1980).[9]

Before Sklar was ever arrested on October 18, 1976, the Philadelphia police and District Attorney's office had the information that Sklar was granted federal use immunity. Before he was interrogated on the crimes in question, the police and the prosecutor knew that he had implicated himself in the Rauer and Fishman murders under a grant of immunity and that the federal government had revoked the immunity because some of what Sklar had told them was untrue. *See supra,* pp. 1257–1258. This raises a suggestion that the evidence used at the trials against petitioner was tainted by the prior knowledge of his personal criminal implications made under immunity and was therefore inadmissible under *Kastigar.*

 Nonetheless, Sklar was given *Miranda* warnings which he explicitly waived before he made each of the inculpatory statements to the Philadelphia police that were used against him at his trials. These statements were detailed and thorough, describing how the murders were planned, executed and how the killer was paid. And finally, these statements identified or created leads for all of the witnesses and physical evidence that was later produced at trial, with the exception of petitioner's later statements to the press. (N.T. 12/27/77, 4.60–4.64).[10]

Sklar now asserts that when he waived his *Miranda* warnings, he relied on his misbelief that the statements which he made could not be used in any court to prosecute him because of his protection through federal immunity. Petitioner contends that, because of this reliance, his *Miranda* waiver was invalid.

Sklar had been told by agents of the federal government and by his lawyer that the immunized statements which he made to federal agents could not legally be used against him in a prosecution for the crimes revealed by these statements. (N.T. 12/22/77, 2.83; 12/27/77, 4.78–4.81).[11] Al-

---

9. *Kastigar* does not directly address the permissible scope of nonevidentiary use of immunized testimony. Circuit courts are split on this question. *Compare United States v. Semkiw, supra; United States v. Pantone, supra; United States v. First W. State Bank,* 491 F.2d 780, 787–88 (8th Cir.), *cert. denied,* 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 49 (1974); *United States v. McDaniel,* 482 F.2d 305 (8th Cir.1973); *United States v. Smith,* 580 F.Supp. 1418, 1421–22 (D.N.J.1984); and *United States v. Dornau,* 359 F.Supp. 684, 687 (S.D.N.Y.1973), *rev'd on other grounds,* 491 F.2d 473 (2d Cir.1974) (all either holding or strongly suggesting that *Kastigar* prohibits nonevidentiary use of compelled testimony) *with United States v. Serrano,* 870 F.2d 1, 16 (1st Cir.1989); *United States v. Mariani,* 851 F.2d 595, 600–01 (2d Cir.1988), *cert. denied,* 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989); *United States v. Crowson,* 828 F.2d 1427, 1431–32 (9th Cir.1987), *cert. denied,* 488 U.S. 831, 109

S.Ct. 87, 102 L.Ed.2d 63 (1988); and *United States v. Byrd,* 765 F.2d 1524, 1528–31 (11th Cir.1985) (all holding or observing that *Kastigar* does not proscribe nonevidentiary use of compelled testimony).

10. While this court has never seen the text of the statements made to the FBI, there was no state investigation that involved Jerry Sklar before his interrogation and statements, (N.T. 12/22/77, 2.27; 12/27/77, 4.15), and Sklar has stated that he tried to make the statements to the police identical to those he made to the federal agents. (N.T. 4/4/78, 567).

11. Testimony also established that Sklar had been wrongly told by his lawyer that he could not be prosecuted for any of the crimes which were discussed in his immunized statements to the FBI. (N.T. 12/28/77, 5.48–5.50, 5.83–5.84, 5.89–5.92, 5.124, 5.128; 2/21/78, 10, 14.)

though the United States Attorney's office revoked its grant of immunity on October 12, 1976, there is substantial evidence that Sklar did not know of this fact when he provided the Philadelphia police with the bulk of the evidence used to obtain his conviction. (N.T. 12/27/77, 4.78, 12/28/77, 5.77–5.81, 5.107, 5.124; 3/13/78, 610–11).

Nevertheless, the police expressly cautioned Sklar, before giving him warnings and before taking his statements, that it was their opinion and the opinion of the District Attorney's office that federal immunity could not protect him from prosecution in the state courts. (N.T. 12/22/77, 2.125–2.126; 12/27/77, 4.26–4.29, 4.57–4.58). While this statement was not entirely accurate and conflicted with what petitioner had been told by his lawyer, it was Sklar's prerogative to remain silent and to confirm his belief that the immunity which he thought he had in fact protected him.

The inquiry whether a waiver is coerced "has two distinct dimensions." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986). "First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quoting *Fare v. Michael,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)).

There is no doubt that Sklar's decision to waive his Fifth Amendment rights was voluntary. He alleges no "coercion of a confession by physical violence or other deliberate means calculated to break [his] will," *Oregon v. Elstad,* 470 U.S. 298, 312, 105 S.Ct. 1285, 1294, 84 L.Ed.2d 222 (1985), and the Pennsylvania Supreme Court found none. He does not allege that he was mentally or physically incompetent. His

allegation that the police failed to supply him with a copy of the letter from United States Attorney David Marston to the District Attorney's office revoking his federal immunity does not comprise coercion. Absent evidence that Sklar's "will [was] overborne and his capacity for self-determination critically impaired" because of coercive police conduct, his waiver of his Fifth Amendment privilege was voluntary under the decision in *Miranda. Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987) (citing *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961)).

There is also no doubt that Sklar's waiver of his Fifth Amendment privilege was made knowingly and intelligently: that is, that petitioner understood that he had the right to remain silent and that anything he said could be used against him. Ignorance of the full consequences of a defendant's decisions to waive his *Miranda* rights does not vitiate their voluntariness. *Connecticut v. Barret,* 479 U.S. 523, 530, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987). "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring,* 479 U.S. at 574, 107 S.Ct. at 857.

Petitioner has a bachelor's degree from Temple University. (N.T. 12/22/77, 2.60–2.61, 2.136). At trial he clearly stated that he understood the *Miranda* warnings as they were given. (N.T. 3/9/78, 298–300; 3/31/78, 310–13). Sklar does not here claim that he was incompetent at the time he made his statements. The record evidences that he understood his right to silence and how to use it during Detective Bowdren's interrogation on the auto theft charges when petitioner refused to discuss his immunity matters and when his statement was taken without any reference to those matters. (N.T. 12/28/77, 5.21–5.22, 5.34).

The Constitution does not protect defendants from their own folly. It is not significant to the voluntariness of Sklar's waiver that the federal prosecutor's office violated petitioner's immunity grant or that the po-

lice or the district attorney did not provide him with the contents of their communication with the federal authorities, in particular the letter revoking federal immunity. While the police did not tell Sklar of the letter's contents or existence, they explicitly warned him that his federal immunity may not protect him. In *United States v. Ricks*, 817 F.2d 692 (11th Cir.1987), the 11th Circuit stated, "whether a defendant understands the evidentiary value of his comments or not, he still may make an incriminating statement, and his lack of understanding regarding the evidentiary value of the statement does not mean that his waiver was not made voluntarily or knowingly." *Id.* at 697. (citing *Harris v. Riddle*, 551 F.2d 936, 939 (4th Cir.1977), *cert. denied*, 434 U.S. 849, 98 S.Ct. 160, 54 L.Ed.2d 118 (1977)).

In light of Sklar's understanding of all of the cautions given him by the police, including the caution against relying on any protection from federal immunity, I find petitioner's statements were obtained through a voluntary waiver of his Fifth and Sixth Amendment rights. The valid waiver of his *Miranda* warnings shows these statements and the evidence that flowed from them to be independent. Therefore, under *Kastigar*, all of the evidence at Sklar's trials was admissible. 406 U.S. at 460, 92 S.Ct. at 1664.

█ As I find that petitioner's statements were not admitted as fruits of a violation of his grant of immunity from the federal government, I find that trial counsel cannot be said to have rendered ineffective assistance for failing to move to suppress the statements as fruits of a violation of a grant of immunity where such a motion would have been useless. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) (a petitioner seeking habeas relief on the

grounds of ineffective assistance of counsel must show that counsel's performance was deficient and that the deficient performance prejudiced the defense).[12]

## INVOLUNTARY CONFESSION

Sklar contends that his confession was the result of trickery and subtle manipulation, by the police and the prosecutor, of such a magnitude as to render it involuntary. Sklar's claim asserts that by not arresting him and by not telling him of the contents of the letter from the federal agents revoking his immunity, the police exploited his misapprehension that federal immunity would protect him from prosecution and lulled him into a sense of security that resulted in his confession.

█ An involuntary confession may result from psychological as well as physical coercion. To determine the voluntariness of petitioner's confession, this court must consider the effect that the totality of the circumstances had upon the will of the defendant. *Miller v. Fenton*, 796 F.2d 598 (3d Cir.1986).

█ The question in each case of possible coercion is whether the petitioner's will was overborne when he confessed. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26, 93 S.Ct. 2041, 2046–47, 36 L.Ed.2d 854 (1973). The factors to be considered include: petitioner's youth; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. at 226, 93 S.Ct. at 2047; *Miller v. Fenton*, 796 F.2d at 604 (citations omitted).

None of the factors indicating coercion are present here. Petitioner is a college

---

**12.** In any case, Timothy Savage, Esquire, who represented Sklar at trial and in pre-trial proceedings cannot be said to have failed to move for suppression of the statements. Counsel's Motion to Suppress petitioner's pre-trial statements was argued thoroughly at the end of a six day suppression hearing before the Honorable Edwin S. Malmed. (N.T. 12/29/77, 6.2–6.33).

Counsel then made a Motion to Dismiss the indictments against Sklar as a violation of a grant of immunity which was heard and argued before the Honorable Merna B. Marshall on February 21, 1978. And, at trial counsel specifically objected to the use and playing of Sklar's taped confessions. (N.T. 3/9/78, 295).

educated man who had planed to enter law school. (N.T. 12/22/77, 2.60–2.61, 2.136–2.137) Though police questioned Sklar over a period of several days, on the days of questioning he was never incarcerated, fingerprinted, arraigned or confined.[13] He appeared alert and cooperative throughout the interrogation. (N.T. 12/22/77, 2.64–67; 12/27/77, 4.32–4.33). At the very least, Sklar knew by the end of the first day, before giving the statements used against him at trial, that he was free to leave and would not be arrested that day. (N.T. 12/22/77, 2.69–70, 2.77, 2.79–82). Finally, he was given *Miranda* warnings which he voluntarily waived.

■ It is possible that in some instances excessive friendliness on the part of the interrogator may create an atmosphere in which a suspect forgets that his questioner is an adversary and makes admissions that he would ordinarily make only to a trusted friend. However, police may use some psychological tactics in eliciting a statement from a criminal suspect as long as the tactics don't deprive the suspect of his ability to make an unconstrained, autonomous decision to make a statement. *Miller v. Fenton,* 796 F.2d at 605.

Moreover, the Supreme Court has indicated that a sympathetic attitude on the part of the interrogator is not in itself enough to render a confession involuntary. *Beckwith v. United States,* 425 U.S. 341, 343, 348, 96 S.Ct. 1612, 1614, 1617, 48 L.Ed.2d 1 (1976); *Frazier v. Cupp,* 394 U.S. 731, 737–39, 89 S.Ct. 1420, 1423–24, 22 L.Ed.2d 684 (1969). Only if other aspects of the interrogation strengthened the illusion that it was non-adversarial in character could petitioner's confession have been involuntary because of psychological coercion. *Miller v. Fenton,* 796 F.2d at 607.

■ The "other aspect" which petitioner complains of is that neither the police nor the prosecutor told him that the United States Attorney had revoked his immunity because the federal agents did not believe his statements. Sklar claimed that he made the statements to the police to prompt an investigation which would speed-up the process by which he could be included into the federal witness protection program. (N.T. 3/13/78, 570; 4/4/78, 565–66). I can conclude from this that petitioner would have me believe that if he had known that the federal agents made a negative determination regarding his inclusion into that program, he never would have made statements to the police.

These circumstances do not establish an atmosphere of coercion. It was not the responsibility of the police or the District Attorney to tell Sklar the contents of the letter if in fact they were aware that he did not know of its existence. Petitioner was repeatedly warned that his reliance on immunity was misplaced and he was given *Miranda* warnings which he validly waived.

I find that Sklar's confession was the product of his independent unconstrained decision to make a statement and was therefore voluntary. Also, I find that petitioner's statement was not the result of misconduct by either the police or the prosecutor in not giving him a copy of the letter from United States Attorney David Marston before he made his statements.

■ Petitioner also alleges that his confession should have been suppressed because of the delay between his arrest and arraignment. An undue delay between arrest and arraignment only gives rise to a constitutional claim when the delay results in a confession that was coerced. *Turner v. Pennsylvania,* 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949); *United States ex rel. Hayward v. Johnson,* 508 F.2d 322, 330 (3rd Cir.1975). As I have found petitioner's confession was a not coerced, this claim does not raise a constitutional question for review in a federal habeas corpus court.

---

**13.** One evening police tried to arrange for petitioner to spend a night in one of their cells because he could find no place to sleep. This attempt was unsuccessful because the detectives were told no one was allowed to use the cells unless they were processed prisoners. (N.T. 3/9/78, 322; 4/3/78, 443).

## CORPUS DELICTI PROOF

Petitioner further contends that his statements were improperly introduced into evidence at trial without independent proof of *corpus delicti*[14]. The petition filed in this court does not allege facts which specify how Sklar's conviction was obtained without sufficient independent proof. *See* Petition For Writ of Habeas Corpus, p. 53–54. The District Attorney also has not submitted any information which would clarify this issue.

In his brief to the state supreme court, Sklar argued that in a case relying on the criminal act of an accomplice, "where the defendant has no personal knowledge about the actual commission of the crime, the Commonwealth should also be required to prove ... that the person it advances as the principal was in fact the perpetrator." *Commonwealth v. Sklar*, No. 12, January Term, 1979, Brief for Appellant, at 33. Consequently, I will read petitioner's claim of insufficient *corpus delicti* proof as asserting that there was insufficient independent evidence to show that James Brown shot the deceased victims.[15]

Petitioner also asserts separately in his petition to this court that there was insufficient evidence to establish that petitioner's co-conspirator shot the victims, apart from petitioner's statements, and that trial counsel failed to challenge the sufficiency of the evidence on the grounds that the Commonwealth did not prove that his co-conspirator committed the murder. Because these claims deal with essentially the same issue as the *corpus delicti* claim, I will address them together.

■ It is well recognized that admissions made by a defendant after the commission of a crime must be corroborated in order to support a conviction. *Opper v.*

*United States*, 348 U.S. 84, 90–91, 75 S.Ct. 158, 162–63, 99 L.Ed. 101 (1954). If the corroborating evidence supports the essential facts admitted, enough to justify a jury inference of their truth, the *corpus delicti* evidence is sufficient. The corroborated facts plus the independent evidence must be enough to find guilt beyond a reasonable doubt. *Id.* at 93, 75 S.Ct. at 164.

■ For the basis of his claims Sklar asserts that his inculpatory statements were the only evidence which the prosecution introduced to prove the fact that his accomplice actually committed the murders for which Sklar was convicted. There is no dearth in this case of *corpus delicti* proof, evidence independent from petitioner's statements which corroborated that Jerald Sklar hired James Brown to shoot and kill the victims for Mike Selkow.

The evidence showed that police found the dead body of Edward Rauer on June 23, 1972, shortly after midnight in his taxicab on the corner of Ardleigh Street and Vernon Road in Philadelphia, one block from Upsal Street where James Brown was living. (N.T. 3/8/78, P. 248–51, Ex. C–9). Mr. Rauer was killed by a shotgun blast at close range. (N.T. 3/10/78, p. 427–28)

In his statement of the Rauer killing, petitioner told of how he met with Brown in June, 1972, and asked him to kill Rauer. Their plan was that Brown would enter Rauer's taxicab at the Bell Telephone office on Arch Street, Philadelphia, where Rauer regularly waited for customers at a certain time each night. He then would shoot Rauer and make the crime look like it was a robbery. Sklar said that Brown told him later that he had entered the cab and done "the job," emptying Rauer's pockets to make it look like a robbery. Brown said

---

**14.** *Corpus delicti*—The body of the crime. The body (material substance) upon which a crime has been committed, *e.g.*, the corpse of a murdered man.... H.C. Black, *Blacks Law Dictionary*, p. 310 (5th Ed.1979).

**15.** There is no dispute here that the victims died of criminal means. Edward Rauer was found dead from a gunshot wound in his taxicab within an hour after the shooting on June 23, 1972. (N.T. 3/8/78, 248–51). Abraham Fishman was

badly wounded on March 5, 1973, by being shot twice in the back outside a food stand on Delaware Avenue in Philadelphia. Dr. Marvin Aronson, the Medical Examiner for the City of Philadelphia, testified it was his opinion, beyond a reasonable doubt, that Mr. Fishman died from the shotgun wounds on January, 22, 1974, with obesity and diabetes contributing to his death. (N.T. 3/31/78, 355).

that he fled to a relative's house in the area afterwards. (N.T. 3/9/78, 296–305, 341).

Evidence at trial showed that the last fare which Rauer took entered his cab at the Bell Telephone Building on Arch Street. Also, a witness described the physical characteristics of the man who entered the victim's taxi to generally fit those of James Brown. (N.T. 3/8/78, 254; 3/9/78, 349–50; Ex. C–9).

Trial evidence also established that Mike Selkow was one of the beneficiaries on a life insurance policy which Selkow and Rauer had on each other as partners in business. This policy was taken out within six months of Rauer's death. Sklar said that James Brown had to wait to be paid for the shooting until Selkow had collected his share of the insurance, $30,000.00. Petitioner described the method of payment in great detail. (N.T. 3/9/78, 342–43; 3/13/78, 521).

On March 5, 1973, in the early morning hours, Abraham Fishman was wounded badly by two shotgun blasts to his back outside a food stand on Delaware Avenue in Philadelphia. He died in January of 1974 from complications of the wounds. His dog, a German Shepherd, was also shot and killed.

Sklar told police that he hired James Brown to kill Fishman for Mike Selkow because Selkow owed Fishman over $6,000.00 and didn't want to repay him. Brown was to be paid with the cash he found on Fishman's body as the victim had a reputation for carrying a lot of money. He was also supposed to recover Mike Selkow's promissory note to the deceased. (N.T. 3/31/78, p. 313–15).

Selkow told Sklar that the shooting should take place at the food stand on Delaware Avenue between 1:00 and 4:00 a.m. when he knew Fishman would be there with Selkow's promissory note and when the area would be isolated and dark. (N.T. 3/31/78, 366–67). Sklar also told the police that Brown stated, after the murder, that he had shot Fishman and killed his dog but that the shots had attracted attention and he didn't have time to go through the

victim's pockets for the note or the money. (N.T. 3/31/78, 314).

Police found the victim at a food stand on North Delaware Avenue at approximately 3:00 a.m., shortly after he was shot. (N.T. 3/30/78, 234–36). Promissory notes written by the decedent were found on his body and admitted at trial, establishing that Selkow had borrowed $9,000.00 from Fishman on October 14, 1972, and that Selkow probably had an unpaid balance of more than $5,000.00. (N.T. 3/30/78, 281). Fishman, who was notorious for carrying a lot of cash, was found with over $5,000.00 on his person. (N.T. 3/30/78, 265). His dog was lying dead nearby from a bullet wound. (N.T. 3/30/78, 234).

Petitioner's confessions demonstrated detailed knowledge of the places and circumstances of the offenses committed. The actions of James Brown as told to police by Sklar are perfectly consistent with the circumstances of the victims' shootings and the assailant's activities.

There are adequate independent facts to corroborate the details of petitioner's statements and thus satisfy the *corpus delicti* proof, providing sufficient evidence for the jury to conclude beyond a reasonable doubt that Sklar's statements were true and that his accomplice shot the victims. *Opper v. United States,* 348 U.S. 84, 92, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954).

Because the circumstantial trial evidence was sufficient to establish that Sklar's accomplice committed the crimes, I find that his counsel did not err if in fact he failed to argue that this evidence was insufficient. Therefore, Sklar was not deprived effective assistance of counsel on this basis. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (a petitioner seeking habeas relief on the grounds of ineffective assistance of counsel must show that counsel's performance was deficient and that the deficient performance prejudiced the defense).

### WITNESS CONFRONTATION

■ Sklar alleges that a trial court ruling which restricted his cross-examination of a newspaper reporter denied him his

right of confrontation. In a motel in New Jersey on March 29, 1977, Sklar met with Daily News reporter Mr. Joseph O'Dowd and gave him information on both the Rauer and Fishman murders as well as information on an unrelated murder. This reporter confirmed the facts given him by Sklar and printed a series of articles on the murders in the Philadelphia Daily News.

The Commonwealth subpoenaed Mr. O'Dowd to testify at both murder trials on the statements Sklar had given to him. At the first trial, the trial of Eddie Rauer's death, counsel for the newspaper objected immediately after Mr. O'Dowd was called to testify.

Counsel for the newspaper stated in chambers that he objected to any testimony by Mr. O'Dowd and, alternatively, the court should limit direct examination to only facts which were revealed in the articles, specifically excluding questions as to the sources of information in the articles. (N.T. 3/9/78, 334).[16] The court overruled the objection but limited direct examination, and therefore cross-examination, to only those facts that were published, disallowing any questions as to sources that were not printed or to any crimes other the murder at issue. (N.T. 3/9/78, 335). It was at this time that defense counsel objected because he would be limited on cross-examination into not inquiring "as to other sources." This objection was overruled. (N.T. 336).

The confrontation clause provides "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has held that this applies to the states by way of the fourteenth amendment. *See Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

"A primary interest secured by [the confrontation clause] is the right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). Cross-examination "is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). The right to confront witnesses is primarily functional to promote reliability in criminal trials. *Lee v. Illinois*, 476 U.S. 530, 540, 106 S.Ct. 2056, 2061, 90 L.Ed.2d 514 (1986). The clause only requires that the criminal defendant have the opportunity for a "full and effective cross-examination." *California v. Green*, 399 U.S. 149, 159, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970).

Sklar was not denied his right to confront and cross-examine the newspaper reporter in the conventional sense. He was restricted in his cross-examination in the same way as the Commonwealth was limited in its direct examination. Mr. O'Dowd testified at both murder trials and was vigorously cross-examined in both cases. (N.T. 3/9/78, 338–47; 3/31/78; 360–390).

The judge's ruling was doubtlessly made in consideration of a Pennsylvania statute which was in effect at the time and which barred the court from requiring the newspaper reporter to disclose his sources.[17] In any case, Judge Smith made a reasoned decision balancing the newspaper's First Amendment rights with the petitioner's Sixth Amendment rights and the state's

---

**16.** This issue had been previously litigated in a Motion to Quash a Subpoena Duces Tecum which the Commonwealth had issued for the tape recording of Sklar's interview with O'Dowd. The decision in that case, by the Honorable Merna Marshall, allowed the Commonwealth access to a redacted transcript of the tape recording. In her opinion and order dated November 1, 1977, Judge Marshall considered the facts in light of a then effective Pennsylvania Shield Law, 28 Pa.C.S.A. § 330 (repealed June 27, 1978). This statute stated in pertinent part:

No person ... employed by any newspaper of general circulation ... for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any court, grand jury, traverse or petit jury, or any officer thereof....

28 Pa.C.S.A. § 330(a) (repealed, June 27, 1978).

**17.** *See supra* p. 1267, n. 16 and accompanying text.

right to gather information for its prosecution.

During both trials the juries had the chance to observe the witness respond when his testimony was challenged so they could assess his words and demeanor for credibility. The restriction on petitioner's cross-examination was no different from the restriction on the prosecution's direct examination. Therefore, I find this claim does not establish a violation of the Confrontation Clause of the United States Constitution.

## INEFFECTIVE ASSISTANCE OF COUNSEL

 Sklar contends he was deprived effective assistance of counsel because his lawyer at trial did not object to the admission of the tape of his confession to the Fishman murder. During the suppression hearing, the prosecutor sought to admit two written statements and the tape recording of the Rauer and Fishman statement. (N.T. 12/29/77, 6.43). The Fishman tape was marked as exhibit C–10 at the suppression hearing. (N.T. 12/27/77, 4.16–4.18).[18] When the prosecutor proposed the tapes he wished to use, he inadvertently referred to the Fishman tape as C–11, which was the tape of the Dr. Fried murder. (N.T. 12/27/77, 4.19; 12/29/77, 6.43). In his request for admission he stated, "... and C–11, which is the tape recording of the Rauer and Fischer [sic] statement." (N.T. 12/29/77, 6.43).

The judge obviously understood the prosecutor to be seeking admission of the Fishman a/k/a Fisher murder tape. Since the prosecutor had said, "we are not seeking admission of the confessions or statements about ... the death of Dr. Fried," there could be little doubt as to which tape the prosecutor wanted the court to rule admissible. (N.T. 12/29/77, 6.44).

In *Strickland v. Washington*, the Court enunciated the standard for determining prejudice:

[A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. *Strickland*, 466 U.S. 668, 696, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674.

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 668, 104 S.Ct. at 2052. Thus the question for this court is whether there is a reasonable probability that, absent the alleged error, the jury would have had a reasonable doubt respecting guilt.

Although the prosecutor mistakenly identified the Fishman tape as C–11, it is obvious that the suppression court's ruling held the tape containing the Fishman statement to be admissible at trial. If Sklar's counsel had objected at trial to the admission of this tape, based on the ruling of the suppression court, it would have been a fruitless effort. Therefore, petitioner has not met the burden of proving that the trial counsel's failure to recognize this discrepancy resulted in a denial of his Sixth Amendment right to effective assistance of counsel.

 Petitioner also claims pre-trial counsel was ineffective for permitting him to give an inculpatory statement to newspaper reporters. Sklar met with Philadelphia Daily News reporter, Joseph O'Dowd in late March, 1977. (N.T. 4/4/78, 572). In addition to O'Dowd and Sklar, reporter Tom Cooney and Sklar's attorney, Edward Schulgan, Esq. were present at the meeting. (N.T. 4/4/78, 572).

Sklar told O'Dowd of his alleged involvement in the Rauer and Fishman shootings. (N.T. 3/9/78, 338–344; N.T. 3/31/78, 361–369). O'Dowd then testified at both the Rauer and Fishman trials concerning this meeting.

The testimony by O'Dowd was merely an accumulation of the testimony and evidence that was or would be before the court. There is no mention in O'Dowd's testimony of outside sources confirming Sklar's accu-

---

18. At the Fishman trial, the statement was marked C–6. (N.T. 3/31/78, 308).

sations. The testimony was merely a re-statement of the facts in Sklar's taped statements and testimony given by other witnesses. Therefore, Sklar has failed to sustain the burden of proving that the outcome would have been different but for counsel's errors, as is required by the second prong of *Strickland.*

### TRIAL COURT ERRORS

The petitioner asserts that a number of trial errors amounted to a deprivation of his due process rights. These are that the trial court: (1) excluded a *res gestae* declaration; (2) permitted the prosecutor to question the United States Attorney as to privileged matters; (3) permitted the prosecutor to cross-examine petitioner as to why he waited until trial to deny that his police statements were true; and (4) failed to grant a mistrial when Assistant District Attorney Haines withheld a portion of the pre-trial police statement of a Commonwealth witness.

The Constitution guarantees a fair trial, not a perfect one. *United States v. Nobel,* 696 F.2d 231, 237 (3d Cir.1982). A trial is fundamentally fair if it results in a verdict reached through consideration of evidence properly admitted. If the total effect of the errors does not render the verdict unreliable, fundamental fairness has been achieved. *Daniels v. Wood,* 819 F.2d 195, 197 (8th Cir.1987), *cert. denied,* 484 U.S. 861, 108 S.Ct. 177, 98 L.Ed.2d 131 (1988); *Johnson v. United States,* 805 F.2d 1284, 1289 (7th Cir.1986); *Crist v. Lane,* 745 F.2d 476, 482 (7th Cir.1984) *cert. denied,* 471 U.S. 1068, 105 S.Ct. 2146, 85 L.Ed.2d 503 (1985).

▮ Sklar contends the trial court erred by not admitting testimony concerning statements made by Abraham Fishman after being shot. At an in-camera conference, Officers Bradley and Maciola stated that Fishman said he suspected he was shot by "Cadillac Joe" or a man called "Cerone," "Simone," or "Cione". (N.T. 3/30/78, 292, 296–297). However, the trial court did not allow the officers to make such a statement before the jury. (N.T. 3/31/78, 304–305).

State courts' decisions violate due process rights when they have little basis in the law or in fact as to be unreasoned or arbitrary. *Smith v. Zimmerman,* 768 F.2d 69, 74 (3d Cir.1985); *United States ex rel. Burnett v. Illinois,* 619 F.2d 668, 670 (7th Cir.1980) *cert. denied* 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980). The court's decision to disallow the testimony was not "unreasoned or arbitrary." The Pennsylvania courts have stated,

... before declarations of a deceased may be admitted as dying declarations, the evidence must, *inter alia,* justify the conclusion that at the time the statements were made, the declarant believed he was in fact dying, and also that death was imminent.

*Commonwealth v. Smith,* 454 Pa. 515, 518, 314 A.2d 224, 225 (1973).

The trial court found Fishman was not excited or contemplating death. Officer Maciola testified that when asked who shot him, Fishman replied "I don't care who did it, get me to the hospital." (N.T. 3/30/78 296). Officer Noe testified that when they arrived at the hospital, Fishman wouldn't let the doctors touch him until he had given all his valuables to Officer Noe. (N.T. 3/30/78 265). Furthermore, the victim did not die until ten months later. *See supra* p. 1265, n. 14.

Furthermore, Fishman was shot in the back. Based on this, the court concluded that Fishman did not have personal knowledge of the identity of his attacker. Since the testimony lacked the established prerequisites for a *res gestae* statement, I conclude that the trial court's decision was well reasoned and does not call into question the fairness of petitioner's trial.

▮ Next, Sklar asserts that a trial court error which allowed the prosecutor to ask Attorney J. Clayton Undercofler, III, a question that the court knew the witness would refuse to answer on the instructions of the United States Attorney General, denied him a fair trial. Mr. Undercofler was the United States Attorney who granted petitioner federal immunity.

**1270**

Before the defense presented its case in the Fishman murder trial and in the judges chambers, Sklar's counsel asked the judge to restrain the Commonwealth from asking Mr. Undercofler about the results of a federal investigation into the evidence petitioner provided to federal agents. Counsel requested this because all of the parties knew the witness would refuse to answer and the lack of answer might result in an implication for the jury that the facts Sklar gave the agents were true.

The judge denied counsel's request, overruling his objection to the question being asked. Further the judge told counsel his in-camera objection would be sufficient to preserve the matter for appeal, that no objection need be made before the jury. (N.T. 4/4/78, 517–18).

On cross-examination Atty. Undercofler discussed the details of the proffer of information made by Daniel Preminger, Esq., before his client, Sklar, was granted immunity. Atty. Preminger had told Atty. Undercofler that his client named an FBI agent who was on Mike Selkow's payroll. The witness stated that a Special Agent had investigated the charges of FBI corruption. When asked what the investigation uncovered regarding the relationship between Selkow and the agent, Mr. Undercofler declined to answer "on the direction of the Attorney General of the United States." (N.T. 4/4/78, 539–40).

Sklar now asserts that the jury was left to infer from Mr. Undercofler's silence that the investigation confirmed the truth of Sklar's pre-trial statements and thus prejudiced his trial defense which contended that the pre-trial statements were fabricated.

However, this is not the only possible inference the jury could have made. Contrary to the conclusion that the FBI agent was found to be corrupt, Mr. Undercofler was permitted to tell the jury on direct examination that the FBI agent who was mentioned in Mr. Preminger's proffer was never reprimanded or accused of any crime by the federal government as a result of what Sklar told them, (N.T. 4/4/78, 533), thus lending credence to Sklar's assertions

that petitioner's statements were concocted by him.

Consequently, I fail to see how petitioner's defense was prejudiced in any way. Even if Sklar had established a showing of prejudice, it would not have undermined my confidence in the trial's outcome. With the combination of the statement Sklar made to police and the factual corroboration by witness testimony, sufficient evidence existed to support a finding of guilty by a rational fact-finder. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

Petitioner's next claim, that the trial court erred by allowing the prosecutor to question as to why Sklar had waited until trial to deny that his statements to the police were true, is patently meritless. During cross examination in the Fishman trial, the prosecutor questioned Sklar about his deception.

And at that point, [when he discovered a warrant had been issued for his arrest] Mr Sklar, you rushed back to the FBI, you rushed back to the police, you rushed back to your lawyer, and you said, hey, whoa, con job. Big joke. Sorry, folks. It was all made up, it's a lie.

(N.T. 4/4/78, 615). The defense objected, but the court overruled the objection. (N.T. 4/4/78, 615).

▋ Sklar asserts that this questioning violated his constitutional right to remain silent embodied in the Fifth Amendment. However, "the Fifth Amendment is not violated when a defendant who testifies in his own defense is impeached with his prior silence." *Jenkins v. Anderson*, 447 U.S. 231, 235, 100 S.Ct. 2124, 2127, 65 L.Ed.2d 86 (1979) See *Raffel v. United States*, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926).

▋ The Court has limited the use of silence in cross-examination, however. "[P]rior silence cannot be used for impeachment where silence is not probative of a defendant's credibility and where prejudice to the defendant might result." *Jenkins v. Anderson*, 447 U.S. 231, 239, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86. See, e.g., *United States v. Hale*, 422 U.S. 171, 180–181, 95 S.Ct. 2133, 2138–2139, 45 L.Ed.2d 99 (1975);

*Stewart v. United States,* 366 U.S. 1, 5, 81 S.Ct. 941, 943, 6 L.Ed.2d 84 (1961); *Grunewald v. United States,* 353 U.S. 391, 424, 77 S.Ct. 963, 984, 1 L.Ed.2d 931 (1957).

■ In the instant case, Sklar testified in his own defense, saying that his prior statements to the police were lies. The prosecutor used Sklar's delay in admitting his attempt to con the federal authorities, to impeach his credibility, and Sklar suffered no prejudice from the question, as the essence of his defense was that he had conned them. Therefore, the court did not err in admitting the exchange between the prosecutor and Sklar.

■ Finally, petitioner alleges that his defense was prejudiced because a page was missing from his copy of Rosemary Hess's written statement. Sklar asserts that the missing page contained facts that would have served as material for cross examination. However, he has failed to show that a page missing from the report denied him a fair trial.

The effect of the page's absence does not rise to a due process deprivation. The witness, Rosemary Hess, was Sklar's girlfriend during the spring and summer before Rauer's death. The substance of Hess's testimony was that a friendly relationship existed between Sklar and Brown, the person who shot Rauer, prior to the Rauer murder. (N.T. 3/9/78, 375–378, 387–392). The missing page may have supplied defense counsel with pre-trial testimony placing the date that the witness first met Brown with Sklar at a time after the date of Rauer's murder. With this information defense counsel could have established an inconsistency in the witness's testimony, casting a shadow on her credibility.

However, there was never an issue that Jerry Sklar met and visited James Brown before Rauer's murder. Sklar's own testimony confirmed a relationship existed between the two that began in the early summer of 1972. (N.T. 3/13/78, 563–564). Sklar admitted being to Brown's house "a dozen or more" times. (N.T. 3/13/78, 563) Furthermore, Lorretta Brown, wife of James Brown, testified that Brown and Sklar "had a social relationship." (N.T. 3/13/78, 363).

Since the substance of Hess's trial testimony, that Sklar knew Brown before Rauer was killed, was corroborated and was never denied, the verdict has not been shown to be unreliable. Hence, the petitioner was not denied due process.

## PROSECUTORIAL MISCONDUCT

Sklar also contends that he was denied a fair trial through prosecutorial misconduct when: 1) the prosecutor asked a defense witness an improper question and 2) the prosecutor made an improper remark to the jury in his closing arguments.

■ Where a petitioner claims that a prosecutor's remarks were constitutionally improper, the relevant inquiry is whether the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting from *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).

■ Petitioner's first complaint regarding the prosecutor was that he asked defense witness, Mike Selkow, if he had tried to "make a deal" with the Commonwealth to testify against Sklar, in connection with possible charges against him. (N.T. 4/5/78, 703). Sklar claims the prosecutor had no factual basis for asking the question; that he merely used it to point out to the jury that Selkow had a personal interest in the outcome of the case and thus the prosecutor prejudiced his defense.

Considering the significant amount of the evidence against Sklar, including the detailed facts contained in his statements to the police implicating himself, the possible inference that Selkow had considered making a deal does not cause this court to question the reliability of the juries' verdicts.

■ Finally, Sklar asserts that the prosecutor made constitutionally improper remarks to the jury in his closing. In his closing argument at the Fishman trial, the

prosecutor posed a question to the jury: "Wouldn't it be ironic if the ultimate con was that he conned you." (N.T. 4/7/78, 931–932). The defense objected and the judge sustained the objection. In a conference in chambers, the defense asked for a mistrial and the motion was denied. (N.T. 7/7/78, 932–933).

The prosecutor's remarks, however, did not compromise the fairness of the trial. The judge sustained the objection of defense counsel and instructed the jury to disregard the statement (N.T. 4/7/78, 933).

Sklar's testimony was contradictory in and of itself. The jury first heard his detailed pre-trial statement to the police implicating himself in the murder. He then testified that he lied to police by "put[ting] together a package ... that the F.B.I. would buy" in the hopes of getting a new life in the witness protection program. (N.T. 4/13/78, 560–562).

The prosecutor's statement was a reference to this evidence properly before the jury. When read in the context of the entire proceeding this claim does not raise an issue of constitutional dimensions.

I have thoroughly examined all of the exhausted claims advanced by petitioner and I find that none of them raises a basis for which a writ of habeas corpus can be granted.

Therefore, I make the following:

## RECOMMENDATION

AND NOW, this 17th day of Aug., 1990, IT IS RESPECTFULLY RECOMMENDED that the petition for writ of habeas corpus be DENIED. This decision rests on a complicated factual scenerio. Because of this complexity, the issues are subject to alternative legal interpretations.[19] Therefore, I

19. The prosecutor here was never required to establish in a Kastigar style hearing whether or not the evidence he presented at either trial was in any way tainted by his exposure to Sklar's testimony under immunity. I find no authority requiring a Kastigar style hearing by state courts under the circumstances of this case. However, the issue is arguable.

further recommend that probable cause for appeal be certified.

In light of the recent decision from the District of Columbia Circuit Court, *United States v. North*, 910 F.2d 343 (D.C.Cir.1990), the split between the Circuit Courts' views on the non-evidentiary use of immunized testimony is further solidified. Hence, this area of law may soon see a clarification.