**Thearthur GRIMES, Petitioner,**

v.

**Glenn S. GOORD, Commissioner, New York State Department of Correctional Services, Respondent.**

No. 02–CV–6202.

United States District Court,
W.D. New York.

July 9, 2004.

307

Thearther Grimes, Attica, NY, pro se.

Loretta S. Courtney, Monroe County District Attorney's Office, Rochester, NY, for Defendant.

## DECISION AND ORDER

BIANCHINI, United States Magistrate Judge.

## INTRODUCTION

Petitioner, Thearthur Grimes ("Grimes"), filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in

Monroe County Court. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(b).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### Basis for the Conviction

The conviction under attack in the present habeas petition stems from a double murder that occurred at 2½ Finch Street in the City of Rochester on December 28, 1993. Grimes was indicted on charges of second degree murder, attempted murder, and first degree assault based on his involvement in the murders. He was convicted of all counts in the indictment following a jury trial.

### The Motive Behind the Finch Street Murders

On December 23, 1993, Darryl Johnson ("Johnson") threw Jerold Usher ("Usher") out of his house at 71 Locust Street in the City of Rochester after learning that Usher intended to use the location as a "gate," in other words, a drug house. Johnson lived at the Locust Street address with his niece, Myra Woods, and her six children. Following his expulsion, Usher returned to the house and fatally shot Johnson ("the Locust Street murder").

Usher then fled to the apartment of David Crutcher ("Crutcher"). Crutcher's apartment, located at 250 Birr Street, was where Usher's older brother Anthony McGee ("McGee"), Timothy Muldrow ("Muldrow"), and Raymond Stubbs ("Stubbs") operated another "gate." Trial Transcript ("Trial Tr.") at 521, 518. Usher burst into the house and immediately ran to the bathroom and began vomiting. After learning what Usher had done, McGee, Muldrow, Stubbs and Grimes, who was in the house at the time of Usher's arrival, discussed the need to eliminate any witnesses to the Locust Street murder. *Id.* at 528–30.

On December 28, 1993, Stubbs showed Crutcher four guns in a bedroom at the Birr Street apartment and said, "Check this out, this [is the] artillery we're going to use tonight." *Id.* at 542. Crutcher, who was under the impression that they were going to kidnap the witnesses to the Locust Street murder, had procured, at McGee's request, a stolen red Ford Probe for the group to use as transportation. *Id.* at 533–34. Armed with the guns that Stubbs had shown Crutcher earlier, Grimes, McGee, Stubbs and Muldrow left the apartment later that night and drove away in the stolen Ford Probe. *Id.* at 552, 559. Crutcher and a man only identified as "Smiley" remained at the apartment with Stubbs's girlfriend and her infant son.

### The Finch Street Murders

Meanwhile, at 2½ Finch Street in Rochester, Deborah Ibezime ("Ibezime") was at home with her boyfriend Darryl Gross ("Gross"), and her two sons, Jerry Brock ("Brock"), aged 14-years old, and Darryl Gross, Jr., an infant. Shortly after midnight, a knock was heard at the front door. When Brock opened the door, Stubbs, whom he knew by the street name of "Raider," entered the house and began speaking with Ibezime, who was lying on a sofa in the living room. *Id.* at 344–45. Brock overheard Stubbs and Ibezime talking about a murder that had occurred on Locust Street. Stubbs apparently asked Ibezime who was present at the time of the shooting. *Id.* at 346. After Ibezime indicated that she was present during the shooting, Stubbs left the house, passing Janice Cartledge ("Cartledge") who had come over to 2½ Finch Street to visit her friend, Ibezime. *Id.* at 399.

About two minutes later, Stubbs returned to the house. When Gross opened the front door, Stubbs claimed that he had

forgotten his keys. *Id.* at 401. Suspicious, Ibezime and Gross told Stubbs that they did not see him with any keys when he came in the first time, but Stubbs nevertheless went into the living room as if to look for them. Seconds later, three men burst into the house wielding guns. *Id.* at 402. The men, who had their jackets zipped up over their faces and skullcaps pulled down tightly on their heads, ordered the occupants of the house, along with Stubbs, to sit or lie down on the floor. Because their clothing mostly obscured their features, Brock only could discern that the intruders were black. Two of the armed men seized Ibezime and dragged her into the dining room, and the third man pushed Gross into the kitchen and sat him down on a stool. *Id.* at 403.

Although the gunmen told Stubbs to leave the house, he walked toward the door and stood in the dining room where one of the gunmen was shouting questions at Ibezime and hitting her with his gun. *Id.* at 403, 408. The two gunmen in the dining room suddenly opened fire on Ibezime, shooting her eight times in the back. *Id.* at 408. They then ran out the front door, followed by Stubbs. Their associate in the kitchen proceeded to shoot Gross in the head. *Id.* at 409. As this gunman passed Cartledge on his way out of the house, he shot her in the chin, seriously wounding her.

All of this carnage was witnessed by Brock as he held his nine-month-old brother on his lap. After the gunmen fled, Brock laid his baby brother on the sofa and ran outside to find help. As he ran toward a friend's house to call the police, Brock saw Stubbs, whom he knew by the nickname "Raider," standing on the corner of Finch and Ravine Streets with the three men who had just shot his mother and his stepfather. *Id.* at 362. Stubbs and his cohorts ran away when they saw Brock looking at them.

### The Rochester Arrests

When the police arrived on the scene at Finch Street, Brock informed them that four heavily armed men, including "Raider," had entered his house and killed his mother and his stepfather. Brock added that "Raider" and the others probably could be found at 350 Birr Street. When the police went to 350 Birr Street, however, no one responded to their knocks. They questioned two neighbors about the identity of the residents of 350 Birr Street, but the descriptions given by the neighbors did not match those of the suspects in the Finch Street shootings. *Id.* at 793. Knowing that there was a drug house located at 250 Birr Street, the police assumed that Brock simply had been mistaken, and they proceeded to that address.

Using a bull horn, the officers directed the occupants of 250 Birr Street to come out of the house with their hands up. *Id.* at 796–97. After about twenty minutes had passed, four people exited the apartment: Stubbs, Crutcher, Stubbs's girlfriend, Zelda Williams, and her child. The man referred to as "Smiley" had left the apartment before Stubbs returned from the crime scene. Stubbs and Crutcher were taken to police headquarters for questioning. Once at the police station, Crutcher indicated that had overheard Grimes, Stubbs, Muldrow, and McGee conspiring to kidnap witnesses to a prior murder.

In the early evening of December 30, 1993, Officer Adami of the Rochester Police Department went looking for Muldrow at his apartment at 17 Englert Street. *Id.* at 870. Muldrow was not at home, but his brother, John Muldrow, ("John Muldrow")was there. Upon seeing the police, John spontaneously said, "I know why you're here. You're here for Tim." *Id.* at

873. John said that his brother was not home and that Officer Adami could look inside for him if he wanted. *Id.* When Officer Adami entered the apartment, he observed, in plain view, a 9–millimeter semi-automatic rifle and clip of ammunition, along with a MAC–11 and a .38 caliber revolver. *Id.* at 875. John Muldrow was taken outside and placed into a police cruiser where he signed a consent-to-search form. During the ensuing search, the police seized the three guns mentioned above, as well as several other guns, a large quantity of cocaine, some explosives, and over $5,000 in cash. *Id.* at 901.

Muldrow was arrested several hours after the search, at about 10:55 p.m. The tactical unit of the police department which had been searching for Muldrow observed him riding in a car. When the police pulled over the car, Muldrow attempted to flee but was taken into custody after a brief foot chase.

McGee was approached by the police on January 24, 1994; he attempted to flee after seeing them and discarded a .38 caliber handgun during the ensuing chase. Ballistics testing later indicated that this gun was the weapon used by Usher in the Locust Street murder.

The fourth suspect, Grimes, remained at large.

### Grimes's Flight to Texas

On February 2, 1994, Investigator Terrence Sheridan ("Sheridan") of the Rochester Police Department obtained information that Grimes was in Houston, Texas, with his girlfriend, Marilyn Hannah ("Hannah"). 10/21/94 Transcript of *Huntley*[1] Hearing ("10/21/94 Tr.") at 8. Sheridan learned that the couple was staying with Hannah's cousin, Rhonda Wilburn, at her

apartment at 10200 North Bammell Drive in Houston. Late in the afternoon on February 2, 1994, Sheridan spoke with Sergeant John Swaim ("Swaim") of the Houston Police Department about the Finch Street murders and faxed Swaim information regarding Grimes and the pending charges against him.

At about 7:55 p.m. Central Standard Time ("C.S.T.") on Thursday, February 3, 1994, Swaim and several other officers from the Houston Police Department arrested Grimes in the parking lot of 10200 North Bammell as he was returning to Wilburn's apartment. 8/28/94 *Huntley* Hearing Transcript ("8/28/94 Tr.") at 16. Grimes was transported to the Houston Police Department, where he arrived at 9:19 p.m. 10/21/94 Tr. at 19. Swaim read Grimes his *Miranda* rights from a pre-printed card, and Grimes agreed to waive them. Having received permission from Sheridan to interrogate Grimes, Swaim questioned Grimes about the events of December 28, 1993. Grimes denied any involvement in the murders, stating that he was at a rap concert that night with his girlfriend. 8/28/94 Tr. at 26. Swaim informed Grimes that he felt that his manner of speaking and body language indicated that he was lying about his involvement in the murders. 8/28/94 Tr. at 27. At about 11:10 p.m., Grimes changed his story. He admitted that he was in the house on Finch Street when the murders occurred, but he insisted that he did not shoot anyone and that he fled when the shots were fired. *Id.* at 27–28. This statement was reduced to writing, and Grimes signed it at 12:17 a.m.

After completing his interview with Grimes, Swaim called Sheridan in Rochester and told him the substance of

---

**1.** In New York State criminal practice, a *Huntley* hearing is held to determine the voluntary nature of a defendant's statements.

*People v. Huntley*, 15 N.Y.2d 72, 78, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).

Grimes's statements. Sheridan indicated that he believed that Grimes had a deeper involvement in the matter and decided to fly to Houston to talk to Grimes himself. *Id.* at 75. Later on the morning of Friday, February 4, 1994, Sheridan and Investigator Gary Schultz ("Schultz") left Rochester by commercial plane for Houston, arriving there at 3:15 p.m. local time. Swaim picked up Sheridan and Schultz at the airport and took them directly to the police station, where Sheridan began interviewing Grimes at 3:40 p.m.

Sheridan re-advised Grimes of his *Miranda* rights, and Grimes waived them. Initially, Grimes repeated to Sheridan the story that he had told Swaim. Sheridan then falsely told Grimes that they had arrested the other three co-defendants, and that they all had confessed. Sheridan told Grimes that if he used this statement, he was going to look like a "big liar." 10/21/94 Tr. at 21–22. Sheridan informed Grimes that he knew that he was at Finch Street with a gun. *Id.* at 22. Grimes admitted that he had a gun, a black and gray 9–millimeter, but he maintained that he did no shooting. *Id.* Grimes explained that "Ant's" (*i.e.*, McGee's) brother "Boo" (*i.e.*, Usher) had been involved in a prior murder on Locust Street, and that they had gone to Finch Street looking for the address of the female witnesses to the murder perpetrated by "Boo." *Id.* Grimes then agreed to give a written statement.[2] Once the statement was completed, Sheri-

2. Grimes's statement to Sheridan read as follows:

"Earlier today, 2/04/94, while I was at the Houston Police Department I gave Sgt. John Swain [*sic*] a statement about what happened at a house on Finch Street in Rochester on 12/28/93. I want to add to that statement. After leaving the concert, John dropped us off at Hub's house on Birr St. John is Tim's brother. We sat up in the house for awhile. There was me, Tim [Muldrow], Raider [*i.e.*, Stubbs], Hub [*i.e.*, Crutcher], Zelda and Anthony. Anthony is called Ant. Ant wanted to go to this house on Finch St. to get the address of the woman that lived on Locusts Street where Ant's brother Boo [*i.e.*, Usher] shot a dude. We drove over to Finch St. and parked around the corner. Hub had stolen a red Probe and we drove that. Me, Tim, Ant and Raider went to Finch St. I drove the Probe. We all walked up to the house and Raider went inside the house. Me, Tim and Ant waited outside at the side of the house. Raider was inside the house for about five minutes and came out. Raider told us that two ladies, a little fat dude and a man were inside. Raider went back pretending that he lost his keys. While the door was open[,] me[,] Tim and Ant walked into the house. Tim had a .38 black revolver, Ant had a MAC–11, and I had a 9mm which was black and gray. Raider didn't have a gun."

Ant was talking to the fat lady and was asking for Myra's address. Ant hit the fat lady with his gun once while he was asking for the address. Tim was in the kitchen, and I was standing in the living room. Next, there was a lot of shooting so I just ran out the house. I didn't shoot anybody. I ran out the house, and then ran through the back yard and jumped into the Probe. The rest of them came after me. I drove off and we went to Raider's house on Ketchem St. I left the Probe over there on a side street near Raider's house. I don't know the street. Raider went and called a cab from a phone booth, I don't know which one. Me and Tim got into the cam and went to Tim's house on Englert St. We took the guns there and left them. Then we called another cab and drove around and drove around. After a while I went to Marilyn's house. She is my girlfriend[.] Her last name is Hannah. I just stayed with a friend at his house and then came down to Texas with Marilyn. We have been down here two weeks staying with Marilyn's cousin[,] Rhonda.

"While at the police department I met with Inv. Sheridan of the Rochester Police and he showed me 4 photo cards with six pictures of black guys on each card. On one card I saw Ant McGee's picture in the lower row, right hand corner. On another I saw Raider's picture in the lower row[,] middle spot. On another I saw Tim's picture in the top row, right hand side, and on another I saw my picture in the top row middle spot."

dan read the statement out loud to Grimes, and then Grimes read it to himself. *Id.* at 24. Grimes said to Sheridan, "It's the complete truth." *Id.* Grimes agreed to sign the statement as long as the police gave him proof that they were taking him back to Rochester. *Id.* at 25. Sheridan informed Grimes that he would be brought before an extradition judge, but Grimes needed to tell the judge that he wanted to be returned to Rochester. *Id.* Grimes agreed to go before the judge, but he refused to sign the statement at that time. *Id.* at 25–26.

Upon learning on Friday evening that the Houston Police Department required a warrant number in order to lodge the arrest warrant, Sheridan determined that they would be unable to obtain a warrant from the Rochester City Court that evening because it was well after business hours. *Id.* at 28. At about 8:00 p.m. on Friday, February 4, 1994, Grimes was taken before a magistrate judge, who accepted Sheridan's representation that there was probable cause to arrest Grimes and granted an extension allowing the police to keep him in custody without any charges being filed for an additional 37 hours. *Id.* at 29.

On Saturday, February 5, 1994, at about 9:15 a.m. Rochester time, Sheridan obtained, via facsimile, an arrest warrant for Grimes from Rochester City Court. *Id.* at 30. Shortly thereafter, Grimes was brought before the extradition judge whom he told that he wanted to return to Rochester. The judge released Grimes to the custody of Sheridan and Schultz, and the three men boarded a plane, arriving in Rochester at about 7:00 p.m. Once there, Sheridan and Schultz brought Grimes to the police station to complete some paperwork. The officers had Grimes's yet unsigned statement with them and attempted to procure his signature on it. They also proceeded to question Grimes about several other homicides in which they believed he was involved. *Id.* at 74. It appeared to the police that Grimes was becoming "agitated" by the questioning concerning other homicides. Grimes told them, "Listen, just give me the statement and let me sign it and put me back in jail." *Id.* at 74–75. After he signed the statement, Grimes was returned to the jail. Grimes was arraigned in Rochester City Court the following morning, Monday, February 7, 1994.

## The Probable Cause—*Huntley* Hearing

Grimes subsequently moved to suppress his statements on several grounds, including that the police intentionally and unlawfully delayed his arraignment so as to prevent his right to counsel from attaching. Following a two-day hearing at which Grimes testified in his behalf, Monroe County Court (Egan, J.) ruled that the substance of Grimes's statements to Swaim and Sheridan were admissible at trial, finding that the police "did not intentionally delay the obtaining of an arrest warrant and number in order to hold the Defendant and[/]or deprive him of any of his rights." 12/08/94 Tr. at 5.[3] However, the court found that Grimes signed the statement for Sheridan on February 6th "merely as a method to get away from further questioning and be returned to his cell." 12/08/94 Tr. at 5. The court held that the actual signing of the statement by Grimes must be suppressed as a result of duress and because it was done in violation of his right to counsel, which had attached upon the filing of the felony complaint and

**3.** Defense counsel asked the court, for purposes of preserving the record, to make a finding as to what the basis was for the delay that occurred prior to Grimes's arraignment. 12/08/94 Tr. at 7. The court replied, "I think it is clearly set out in the transcripts," and made no further findings. *Id.*

arrest warrant in Rochester City Court on Saturday, February 5, 1994. *Id.* at 6.

**The Trial**

Trial commenced on April 24, 1995, in Monroe County Court, Judge Egan presiding. Grimes was tried separately from his co-defendants.

A key witness for the prosecution was 25–year–old Crutcher (a/k/a "Hub"), whom the trial court deemed to be an accomplice as a matter of law based on his role in procuring the car allegedly used by the defendants in their commission of the murders. Crutcher, who had been diagnosed with chronic schizophrenia,[4] testified that he was approached in November or December 1993 by McGee who asked to be allowed to sell drugs out of Crutcher's house. Trial Tr. at 515–16. At first, Crutcher declined. However, when McGee offered him $45, Crutcher agreed to let McGee use his phone to transact drug business. Crutcher testified that Grimes, along with Stubbs and Muldrow, eventually sold cocaine out of his house. *Id.* at 518.

Crutcher related that on December 23, 1993, he was present in the apartment when McGee's little brother, Jerold Usher, said that he had engaged in "a little scuffle" at a "gate" (*i.e.*, drug house) over on Locust Street, and that he needed McGee to help him take care of it. *Id.* at 523–24. McGee and Usher then left the house together. Some time later, Crutcher said, Usher returned by himself, "stumbling" and "vexed out," or agitated. Usher proceeded straight to the bathroom, where he started vomiting. *Id.* at 527. Stubbs, McGee, Muldrow and Grimes all were present at Crutcher's house at that time.

McGee told Crutcher that his brother had shot someone, that it was not Crutcher's problem, and that McGee would handle it. *Id.* at 528. Crutcher testified that all of the co-defendants discussed the need to determine who the witnesses to the shooting were, and talked about a plot to kidnap them, hold them hostage, and "torture them into a conversation." *Id.* at 530. There was no talk of killing anybody at that time. *Id.*

The following day, at McGee's request and using McGee's money, Crutcher paid one of his acquaintances to steal a car for McGee to use. *Id.* at 532. The car, a red Ford Probe, was stolen from the East Avenue area on December 27, 1993.[5] Crutcher had the thief park it one block over from Crutcher's house for future use. *Id.* at 535.

On December 28, 1993, at about 5:00 p.m., Crutcher recalled that Stubbs led him into Stubbs's bedroom. Pulling back the blankets on his bed, Stubbs revealed to Crutcher four guns, one of which was a 9–millimeter. Stubbs said, "[Y]o, man, check this out, this artillery we're going to use tonight[.]" *Id.* at 542. Crutcher said that he saw a black and gray 9–millimeter, a Tech–9, a sawed-off shotgun, and a handgun. Crutcher left the house for a while,

---

4. Crutcher testified that he was not taking any medication for his illness in December 1993. Crutcher explained that the medication stopped the voices in his head. At trial, he testified that he was not hearing any voices in December 1993. Defense counsel confronted Crutcher with his prior in-court statement, from co-defendant Muldrow's trial, in which he admitted that when he was living by himself on Birr Street at that time, he was hearing voices that were keeping him awake. Tri-

al Tr. at 666–69. Crutcher admitted to the regular use of cocaine, marijuana and alcohol during that time. *Id.* at 607. In particular, Crutcher smoked marijuana and consumed gin on December 28, 1993, but did not use any cocaine.

5. Robin Ryan testified at trial that her red Ford Probe was stolen near East Avenue on December 27, 1993. Trial Tr. at 814–15.

and when he returned at about 11:00 p.m., he found Stubbs, McGee, Muldrow and Grimes standing in the kitchen holding guns. *Id.* at 551–52. Crutcher was able to identify the kind of gun that Stubbs, McGee and Muldrow each were holding, but he could not remember what Grimes's gun looked like. Crutcher testified that all four men were dressed in dark colors with face masks on. *Id.* at 554.

Stubbs, McGee, Muldrow and Grimes then left in the Ford Probe with their guns. *Id.* at 560. About 45 minutes later, Stubbs returned to Crutcher's apartment acting "very vexed out" and "shaky." *Id.* at 561. He was asking questions such as, "Did they make it back yet?" and "Did they call yet?" *Id.* At the time, Stubbs was carrying a silver 9–millimeter gun. Still agitated, Stubbs demanded that Crutcher play video games with him, and Crutcher complied. *Id.* at 562. It was shortly thereafter that the police appeared at Crutcher's house and took all of the occupants into custody.

At trial, the prosecution presented ballistics evidence that two of the guns seized from Muldrow's apartment fired the bullets that killed Ibezime. *Id.* at 856–60. A third gun found in Muldrow's apartment was consistent with the weapon used to fire the shots that killed Gross and injured Cartledge. *Id.* at 961.

On May 2, 1995, the jury returned a verdict convicting Grimes of all counts of the indictment. On June 7, 1995, the court sentenced Grimes as a second felony offender to an aggregate sentence of 62½ years to life.

Through new appellate counsel, Grimes raised the following arguments on direct appeal: (1) the police unlawfully and intentionally delayed his arraignment; (2) the prosecution erroneously failed to specify the crime underlying the burglary, necessitating reversal of the felony-murder con-

victions; (3) the court improperly imposed consecutive sentences; and (4) the court erred in admitting evidence of uncharged crimes. The Appellate Division, Fourth Department, unanimously affirmed his conviction on November 13, 2000. *People v. Grimes,* 277 A.D.2d 945, 716 N.Y.S.2d 240 (4th Dept.2000). The New York Court of Appeals denied leave to appeal on January 22, 2001. This habeas petition followed.

For the reasons set forth below, Grimes's § 2254 petition is denied.

## DISCUSSION

### I. Exhaustion

A petitioner must exhaust all available state remedies either on direct appeal or through a collateral attack of his conviction before he may seek a writ of habeas corpus in federal court. 28 U.S.C. § 2254(b); *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994), *cert. denied,* 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995). The exhaustion of state remedies requirement means that the petitioner must have presented his constitutional claim to the highest state court from which a decision can be obtained. *See Morgan v. Bennett,* 204 F.3d 360, 369 (2d Cir.2000) (citing *Grey v. Hoke,* 933 F.2d 117, 119 (2d Cir.1991)). A claim is properly exhausted when the state court is fairly apprised of the claim's federal nature and of the factual and legal premises underlying the claim. *Grey,* 933 F.2d at 119–20. Respondent makes no claim that Grimes has failed to exhaust his state remedies, and the Court finds that all of Grimes's claims are fully exhausted and properly presented on habeas review.

### II. Procedural Default

The Supreme Court has made clear that the "adequate and independent state

ground doctrine applies on federal habeas [review]," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (citations & internal quotations omitted); *see also, e.g., Schlup v. Delo,* 513 U.S. 298, 314–16, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).[6] "[I]n order to preclude federal review [under the adequate and independent state ground doctrine], the last state court to render judgment must 'clearly and expressly state [ ] that its judgment rest[ed] on a state procedural bar.'" *Jones v. Vacco,* 126 F.3d 408, 415 (2d Cir.1997) (quoting *Glenn v. Bartlett,* 98 F.3d 721, 724 (2d Cir.1996), *cert. denied,* 520 U.S. 1108, 117 S.Ct. 1116, 137 L.Ed.2d 317 (1997)).

■ Grimes was convicted on two counts of felony murder,[7] the underlying felony being burglary. Grimes contends that the intent to commit an underlying crime must be proven as part of the burglary, but the prosecution failed to specify which crime Grimes tended to commit when he unlawfully entered the victims' house. Without proof of an underlying crime for the burglary, Grimes reasons, the prosecution established only that Grimes committed criminal trespass, which cannot serve as a predicate for felony murder. On direct appeal, the Fourth Department rejected the "underlying crime" claim as not preserved for appellate review, relying upon on New York's contemporaneous objection rule (Criminal Procedure Law ("C.P.L.") § 470.05) because Grimes failed to raise an objection to the lack of an underlying crime to support the burglary charge at time of trial. Respondent argues that, as a result, Grimes has procedurally defaulted on this claim.

In the present case, then, there is a procedural bar since the Appellate Division "explicitly invoke[d] a state procedural bar rule as a separate basis for decision," *Harris v. Reed,* 489 U.S. at 264, 109 S.Ct. 1038. The Second Circuit has held that the failure to object at trial when required by

---

**6.** A miscarriage of justice occurs "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, . . . ." *Murray,* 477 U.S. at 496, 106 S.Ct. 2639; *see also Dixon v. Miller,* 293 F.3d 74, 81 (2d Cir.2002). A petitioner establishes actual innocence by demonstrating that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Dixon,* 293 F.3d at 81 (internal quotations and citations omitted). In this context, " 'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623–24, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (citing *Sawyer v. Whitley,* 505 U.S. 333, 339, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992)).

**7.** Section 125.25(3) of the Penal Law constitutes New York's "felony murder" statute. This section provides that a person is guilty of second degree murder when "(3) [a]cting either alone or with one or more other persons, he commits or attempts to commit [certain enumerated felonies, including burglary but not assault or murder], an, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants[.] . . ." N.Y. Penal Law § 125.25(3). "Felony murder differs from other homicides in that it does not require a *mens rea* directly relating to death." *People v. Stokes,* 88 N.Y.2d 618, 623, 648 N.Y.S.2d 863, 671 N.E.2d 1260 (1996). "By operation of law, the intent necessary to sustain a murder conviction is inferred from the intent to commit a specific, serious, felonious act, even though the defendant, in truth, may not have intended to kill." *People v. Gladman,* 41 N.Y.2d 123, 125, 390 N.Y.S.2d 912, 359 N.E.2d 420 (1976).

New York's contemporaneous objection rule is an adequate and independent state ground. *See, e.g., Fernandez v. Leonardo,* 931 F.2d 214, 216 (2d Cir.), *cert. denied,* 502 U.S. 883, 112 S.Ct. 236, 116 L.Ed.2d 192 (1991); *see also Murray v. Carrier,* 477 U.S. 478, 485–92, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). The Appellate Division's holding that Grimes's claim was not preserved for review, therefore, was consistent with Second Circuit rulings on New York's contemporaneous objection rule. This procedurally defaulted claim may only be reviewed on federal habeas if Grimes makes an adequate showing of cause and prejudice. *See Coleman v. Thompson,* 501 U.S. 722, 748–49, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

Grimes alleges neither cause for, nor prejudice resulting from, the procedural default of the this claim, and the Court finds neither on the record before it. Nor has Grimes made a colorable showing of actual innocence so as to warrant a finding that a miscarriage of justice will occur should the Court decline to review the claim. Accordingly, this claim is barred from habeas review.

## III. Standard of Review

This petition was filed after the enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and is subject to its revisions to 28 U.S.C. § 2254. Pursuant to AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Pursuant to the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [that] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495. In order to grant the writ, the reviewing court must find "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

## IV. Merits of the Petition

### A. Delay in arraignment

Grimes argues that "[e]ven though the police had probable cause to arrest [him], they delayed having him arraigned solely to obtain two statements from him." According to Grimes, this is an "impermissible reason" for a delay in arraignment.

The Appellate Division held that "[t]he police may question an accused in the absence of counsel prior to filing an accusatory instrument." *People v. Grimes*, 277 A.D.2d at 945, 716 N.Y.S.2d 240 (citing *People v. Martin*, 254 A.D.2d 692, 678 N.Y.S.2d 552 (4th Dept.1998)). The Fourth Department's holding in Grimes's appeal appears to be in line with New York law concerning the timing of a defendant's arraignment. *See, e.g., People v. Caviano*, 194 A.D.2d 429, 431, 599 N.Y.S.2d 251 (1st Dept.1993) (where detectives deliberately failed to secure an arrest warrant before speaking with defendant in order to avoid triggering his right to counsel, such action did not warrant suppression of statement) (citing *People v. Robles*, 72 N.Y.2d 689, 695–699, 536 N.Y.S.2d 401, 533 N.E.2d 240 (1988)). Furthermore, the Supreme Court clearly has held that

> [t]here is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. *Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.*

*Hoffa v. United States*, 385 U.S. 293, 310, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (emphasis supplied); *accord, People v. Middleton*, 54 N.Y.2d 474, 481, 446 N.Y.S.2d 211, 430 N.E.2d 1264 (1981).

■ To the extent that federal habeas courts have even considered the constitutionality of delaying arraignment of state defendants, they have only done so as part of an analysis, pursuant to the Fifth Amendment, of the voluntariness of confessions. *Holmes v. Scully*, 706 F.Supp. 195, 203 (E.D.N.Y.1989); *Sklar v. Ryan*, 752 F.Supp. 1252, 1264 (E.D.Pa.1990) ("An undue delay between arrest and arraignment only gives rise to a constitutional claim when the delay results in a confession that was coerced.") (citations omitted), *aff'd*, 937 F.2d 599 (3d Cir.1991); *Blount v. Keane*, 1992 WL 210982, at *3–4 (E.D.N.Y. Aug.6, 1992) (rejecting habeas petitioner's claim that right to counsel violated because police "strategically delayed" arraignment to allow petitioner to be questioned in the absence of counsel); *Haywood v. Portuando*, 288 F.Supp.2d 446, 466 (S.D.N.Y.2003) (rejecting claim by petitioner, who was held 32 hours prior to arraignment, that his constitutional rights were violated because police intentionally and unnecessarily delayed his arraignment so that he could be questioned and give statements without the assistance of counsel). Thus, a delay in arraigning a state defendant is not, in itself, a constitutional violation, but is at most a factor to be weighed in determining whether or not, viewed in the totality of the circumstances, an incriminating statement was the product of police coercion.[89]

---

**8.** *Holmes v. Scully*, 706 F.Supp. at 204 (citing, *inter alia, United States ex rel. Wade v. Jackson*, 256 F.2d 7, 11–12 (2d Cir.), *cert. denied*, 357 U.S. 908, 78 S.Ct. 1152, 2 L.Ed.2d 1158 (1958) (granting habeas relief where petitioner was kept incommunicado and appeared to have been physically tortured during 23½ hour delay between arrest and arraignment); *Robinson v. Smith*, 451 F.Supp. 1278, 1289 (W.D.N.Y.1978) (reversing conviction where delay in arraigning defendant resulted in his making inculpatory statement regarding participation in robbery without having been informed that he was also charged with felony murder, because under such circumstances defendant did not know "the nature of the

■ However, Grimes did not argue on direct appeal, nor does he here, that his two statements to police were involuntary. In any event, the circumstances surrounding Grimes's statements indicate that they were voluntarily given. Grimes was interviewed by Swaim from about 9:30 p.m. until 12:17 a.m., less than three hours. He was offered food and drink and was able to use the restroom if he needed to. Following that period of questioning, Grimes was brought to the Houston jail where he spent the night. Grimes was not questioned again until the following afternoon, when he was interrogated by Sheridan for a little under four hours, from 3:40 p.m. until 7:20 p.m. Moreover, there was no testimony that Grimes had been deprived of sleep the night before or was suffering from the after-effects of drugs or alcohol use, factors which could have made him more susceptible to psychological pressure Although Sheridan lied to Grimes about the fact that all of his co-defendants had confessed and implicated him,[10] "a falsehood by a police officer, although deplorable, does not necessarily induce an involuntary confession." *McNeal v. Rdo*, 1988 WL 108440, at *4 (S.D.N.Y. Oct.6, 1988) (holding that petitioner was not improperly induced to confess by police officer's attempt to convince him that the polygraph machine was infallible), *cert. denied*, 493 U.S. 1030, 110 S.Ct. 744, 107 L.Ed.2d 762 (1990) (citing *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (police misrepresentations as to co-suspect's admissions not sufficient under totality of circumstances to conclude confession was

---

seriousness of the charges against him"); *Stroble v. California*, 343 U.S. 181, 196–97, 72 S.Ct. 599, 96 L.Ed. 872 (1952); *Gallegos v. Nebraska*, 342 U.S. 55, 63–65, 72 S.Ct. 141, 96 L.Ed. 86 (1951); *United States ex rel. Kassim v. Wilkins*, 298 F.2d 479, 480 (2d Cir.), *cert. denied*, 371 U.S. 832, 83 S.Ct. 54, 9 L.Ed.2d 69 (1962); *United States v. LaVallee*, 279 F.2d 396, 399 (2d Cir.), *cert. denied*, 364 U.S. 922, 81 S.Ct. 289, 5 L.Ed.2d 262 (1960); *accord, e.g., Pritchett v. Portuondo*, 2003 WL 22472213, at *10 (S.D.N.Y. Oct.31, 2003); *Beniquez v. Bennett*, 2003 WL 21508329 (E.D.N.Y.2003)).

9. Because Grimes is a state prisoner, he cannot avail himself of the so-called *"McNabb–Mallory"* rule. In *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), the Supreme Court, exercising its supervisory power over the federal courts, held that unnecessary delays between arrest and arraignment required suppression of confessions which the defendants made during that period. Subsequently, Federal Rule of Criminal Procedure 5(a) was adopted, requiring in federal criminal cases that an arrested person must be brought before a magistrate or state official "without unnecessary delay." The Supreme Court subsequently held in *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1947), that Rule 5(a) forbids a delay which is "of a nature to give opportunity for the extraction of a confession." *Id.* at 455, 77 S.Ct. 1356.

However, the *McNabb–Mallory* rule, since it is supervisory and not constitutional in nature, is inapplicable to state prosecutions. *Holmes* (citing *Gallegos v. Nebraska*, 342 U.S. 55, 63–64, 72 S.Ct. 141, 96 L.Ed. 86 (1951); *Brown v. Allen*, 344 U.S. 443, 476, 73 S.Ct. 397, 97 L.Ed. 469 (1953); *Burns v. Wilson*, 346 U.S. 137, 145 n. 12, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (*McNabb–Mallory* rule inapplicable in the courts-martial); *United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 330 n. 27 (3d Cir.), *cert. denied*, 422 U.S. 1011, 95 S.Ct. 2637, 45 L.Ed.2d 675 (1975); *Smith v. Warden, Maryland Penitentiary*, 477 F.Supp. 500, 501 (D.Md.1979); *United States ex rel. Chennault v. Smith*, 366 F.Supp. 717, 724 n. 11 (E.D.N.Y.1973), *aff'd*, 495 F.2d 1367 (2d Cir.1974), *cert. denied*, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974); *Culombe v. Connecticut*, 367 U.S. 568, 590–91, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (fourteenth amendment does not prohibit a state "from such detention and examination of a suspect as, under all the circumstances, is found not to be coercive"; citing numerous cases)).

10. In point of fact, only Stubbs (the individual who helped the gunmen gain entry to the victims' house) had orally confessed and implicated Grimes at that time.

involuntary); *Miller v. Fenton,* 796 F.2d 598 (3d Cir.) (lie about time of victim's death not "sufficient trickery" to overcome defendant's will), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986)). Although this Court does not condone Sheridan's leveraging tactic, it nevertheless cannot find under applicable law that it made Grimes's confession involuntary.

■ Lastly, if Grimes's claim is viewed as resting on an alleged violation of the Sixth Amendment right to counsel, the Court must reject it. As discussed above, police delay in arraigning an arrested person does not in itself justify habeas relief, except insofar as it contributes to a finding that the accused's inculpatory statements were the product of coercion. *See, e.g., Holmes v. Scully,* 706 F.Supp. at 205. Moreover, the right to counsel only comes into existence "at or after the initiation of adversary judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (no right to counsel at pre-arraignment lineup); *Moran v. Burbine,* 475 U.S. 412, 428–32, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (no right to counsel at custodial interrogation prior to initiation of adversary judicial criminal proceedings). "A mere delay in arraigning an arrested person—which is not in itself a cognizable constitutional violation—cannot give rise to a right to counsel where no such right exists." *Holmes,* 706 F.Supp. at 205. The Appellate Division's rejection of Grimes's delayed arraignment claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

### B. Improper imposition of consecutive sentences

Grimes was sentenced to 25 years to life for the murder of Deborah Ibezime; 25 years to life for the murder of Darrell Gross; 12½ to 25 years for the attempted murder of Janice Cartledge; and 7½ to 15 years for the first degree assault of Janice Cartledge. The sentences regarding the Cartledge charges were set to run concurrently with each other, but consecutively to the Gross and Ibezime counts. The Gross and Ibezime counts were set to run consecutively to each other. Grimes argues that because the felony underlying the burglary was unstated, some jurors may have considered the attack upon Cartledge to have been the underlying crime for the felony murder charge. Thus, Grimes argues, to the extent that the felony murder charges were based upon the Cartledge assault, the sentences for the Cartledge counts should run concurrently with the sentences for the murder convictions.

■ The assertion that a sentencing judge abused his or her discretion in sentencing is generally not a federal claim subject to review by a habeas court. *See Fielding v. LeFevre,* 548 F.2d 1102, 1109 (2d Cir.1977) (citing *Townsend v. Burke,* 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948)). "No federal constitutional issue is presented where ... the sentence is within the range prescribed by state law." *White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992). Penal Law § 70.25(2) provides that concurrent sentences must be imposed

> [w]hen more than one sentence of imprisonment is imposed on a person for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other.

N.Y. Penal Law § 70.25(2). Here, however, Grimes and his cohorts committed three separate acts: they fatally shot Ibezime, they fatally shot Gross, and they shot

Cartledge, seriously wounding her. Although all of the shots may be described as having been fired the course of a single extended criminal transaction, there clearly were three separate acts that resulted in the deaths of Ibezime and Gross and the injury of Cartledge. Furthermore, neither act committed against Cartledge was a material element of the charges relating to Ibezime and Gross. *Compare, e.g., People v. Catone,* 65 N.Y.2d 1003, 494 N.Y.S.2d 97, 484 N.E.2d 126 (1985) (consecutive sentences improper where defendant was charged with manslaughter as a result of killing a pedestrian by striking her with his car and with leaving the scene of the accident; the manslaughter was a material element of the charge of leaving the scene). Thus, the trial court properly exercised its discretion under Penal Law § 70.25 in issuing consecutive sentences to Grimes. This claim is not a proper basis for habeas relief.

### C. Erroneous admission of uncharged crimes evidence

At the commencement of trial, the prosecution made an application under *People v. Molineux* [11] to admit certain uncharged crimes and evidence of antisocial behavior involving Grimes into evidence, namely, (1) that Stubbs, Muldrow, McGee and Grimes were members of an "organization" selling drugs out of 71 Locust Street and 250 Birr Street; (2) that Usher was a part of this group; (3) that Usher returned to 71 Locust Street and shot the occupants using a .38 caliber handgun given to him by McGee; (4) that McGee was arrested in possession of a .38 caliber handgun ballistically matching the shell casings found at 71 Locust Street; (5) that Muldrow supplied the cocaine to be sold at Crutcher's house; (6) that the police seized cocaine,

numerous guns, gun paraphernalia, and explosive devices from Muldrow's apartment; and (7) that McGee had Crutcher obtain a stolen car for him. Trial Tr. at 15–23. The trial court instructed the prosecutor to use the word "group" rather than "organization," on the ground that the connotation of "organization" was too formal. In addition, the trial court precluded the prosecutor from introducing evidence of the explosive devices and any guns other than the murder weapons. The trial court also agreed to give a limiting instruction at any time requested by defense counsel during trial and also during the final charge. *Id.* at 24.

Grimes argues that the introduction of this uncharged crimes testimony was not probative of his guilt and was unduly prejudicial, thereby denying him a fair trial. On direct appeal, the Fourth Department held that the trial court "properly allowed the People to establish motive by presenting evidence of prior uncharged crimes." *People v. Grimes,* 277 A.D.2d at 945, 716 N.Y.S.2d 240 (citations omitted).

■ Federal habeas corpus relief does not lie for mere errors of state law. *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The Due Process Clause nevertheless requires that state courts conducting criminal trials "proceed consistently with 'that fundamental fairness' which is 'essential to the very concept of justice.'" *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998) (quoting *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)). Only errors of state law that rise to the level of a constitutional violation may be corrected by a habeas court. *Estelle,* 502 U.S. at 75, 112 S.Ct. 475 (evidence of uncharged crim-

---

11. *People v. Molineux,* 168 N.Y. 264, 61 N.E. 286 (1901), held that the prosecution is allowed to present evidence of a defendant's

prior uncharged criminal or immoral acts for limited purposes, including proving motive, identity, and intent

inal conduct should only be excluded if its introduction would "so infuse the trial with unfairness as to deny due process of law").

■ Despite the probative value of evidence of similar uncharged crimes, it is generally excluded under New York law for policy reasons "because it may induce the jury to base a finding of guilt on collateral matters or to convict a defendant because of his past." *People v. Alvino*, 71 N.Y.2d 233, 241–42, 525 N.Y.S.2d 7, 519 N.E.2d 808 (1987). The trial court may admit such evidence, however, "if it helps to establish some element of the crime under consideration or is relevant because of some recognized exception to the general rule." *Id.* ("[E]vidence of uncharged crimes may be relevant to show (1) intent, (2) motive, (3) knowledge, (4) common scheme or plan, or (5) identity of the defendant. The list, of course, is not exhaustive."). Such evidence also may be admitted if it is necessary to complete the narrative of events surrounding the alleged crime. *E.g., People v. Davis*, 251 A.D.2d 91, 674 N.Y.S.2d 645 (1st Dept. 1998). The evidence will be allowed so long as its probative value and the need for the evidence outweighs the potential for prejudice to the defendant. *People v. Alvino*, 71 N.Y.2d at 242, 525 N.Y.S.2d 7, 519 N.E.2d 808.

The rule in New York parallels Federal Rule of Evidence 404(b), which governs the admission of evidence of other crimes, wrongs or bad acts in the federal trial courts. Under Rule 404(b), such evidence is admissible not to show a propensity to commit the crime charged, but it is admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of accident or mistake." Fed.R.Evid. 404(b). *See also United States v. Inserra*, 34 F.3d 83, 89 (2d Cir.1994) (evidence of uncharged bad acts and/or crimes is admissible "for

any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test"). Evidence of bad acts is admissible under Rule 404(b), for example, if it is "necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir.1997).

■ Here, the trial court allowed proof that the police found large quantities of money, several of the guns used in the Finch Street murders, as well as cocaine and marijuana, at the apartment of Timothy Muldrow, one of Grimes's co-defendants. Trial Tr. at 890, 901, 1175–76, 869–70. The prosecution also introduced evidence that Grimes and his co-defendants dealt drugs and that one of Grimes's associates, Usher, killed a man on Locust Street. This evidence was admissible for the purpose of demonstrating Grimes's motive and intent in carrying out the shootings of the witnesses to the Locust Street murder.

Thus, the Court finds that the Appellate Division properly determined that the uncharged crimes evidence was relevant to the issues presented at trial. Furthermore, the jury was free to balance the uncharged crimes evidence against testimony by Myra Woods, Darryl Johnson's niece who lived with him at 71 Locust Street, that she knew of no one by the name of "Fred G." or "Retard" (both of which were Grimes's street names) as being involved in selling drugs out of that address. As discussed above, the Darryl Johnson shooting, which sparked this entire tragic chain of events, was precipitated by Johnson's refusal to allow Usher, McGee and his associates to deal drugs out of his house.

Furthermore, Myra Woods testified at trial that she did not recognize Grimes and had never seen him before. William

Woods, who also lived at 71 Locust Street, testified in substantially the same manner as Myra Woods. The jury also could have credited several inconsistencies in witness Jerry Brock's testimony pointed out by defense counsel—namely, that Brock saw "Raider" (*i.e.*, Stubbs) and three men with guns enter his house, but when he called 911, he told the police that there were five men. Brock also was mistaken as to their address. Additionally, the trial court gave repeatedly gave the appropriate limiting instruction [12] after the various items of evidence were introduced. The trial judge revisited the issue in its charge to the jury, when he reiterated his limiting instruction and added that the "fact that I allowed you to hear such evidence should not be considered by you that I have an opinion as to its value to prove that purpose." Trial Tr. at 1284–85. This Court must assume that jurors understood and followed the judge's limiting instructions. *See Zafiro v. United States,* 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *Roldan v. Artuz,* 78 F.Supp.2d 260, 281 (S.D.N.Y.2000).

While this The Court agrees that the uncharged crimes evidence, in particular the evidence regarding Grimes's participation in a group that sold drugs and used guns to intimidate those who sought to prevent them from carrying out their business, had a potential for prejudice, it cannot find prejudice here. Because there are procedural safeguards that can prevent or mitigate the unduly prejudicial effect of certain evidence, such as the strong and repetitive limiting instructions used by the trial court, this court concludes that

there were no constitutional infirmities upon which this court can grant relief. The existence of an independent record of other admissible evidence sufficient to support a verdict, including Grimes's own statements, David Crutcher's testimony, and the ballistics evidence strengthens this view. In light of these factors, Grimes cannot establish that the challenged testimony prejudiced him and made his trial fundamentally unfair.

## D. Ineffectiveness of appellate counsel

Grimes contends that his appellate counsel was ineffective in not arguing on direct appeal that his trial attorney erroneously failed to raise as a basis for excluding Grimes's statements the argument that his arrest was not supported by probable cause. The Fourth Department denied his request for *coram nobis* relief on this ground in a summary order. Respondent makes no substantive argument in opposition to Grimes's contentions, and, in fact, does not address the merits of Grimes's ineffective assistance argument.

In order to prevail on a claim of ineffective assistance of counsel within the framework established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (*"Strickland"*), a habeas petitioner must satisfy a two-part test. First, he must show that his attorney's performance "fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. 2052, and second, he must show that there is a "reasonable probability" that but for coun-

---

**12.** The trial court's limiting instruction informed the jury that the fact that the defendant "committed another crime or crimes or has committed antisocial acts is no proof whatsoever that he possessed a propensity or disposition to commit the crime charged in this indictment or any other crime. It is not offered for such purpose and must not be considered by you for that purpose. Instead, the People offer such evidence solely for the purpose of motive and to complete background narrative and solely as contentions of the Prosecution. I charge you that such evidence may be considered by you only for such limited purpose and for none other." *E.g.,* Trial Tr. at 24.

sel's error, the outcome would have been different, *id.* at 694, 104 S.Ct. 2052. Although the *Strickland* test was formulated in the context of evaluating the effectiveness of trial counsel, the same standard applies to claims regarding the performance of appellate counsel. *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994) (citing, *e.g., Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir.1992)).

■■■■ Appellate counsel need not present every nonfrivolous argument that could be made on petitioner's behalf. *Mayo,* 13 F.3d at 533; *see also Evitts v. Lucey,* 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (emphasizing that appellate counsel "need not advance every argument, regardless of merit, urged by the appellant"). Moreover, reviewing courts should not employ hindsight to second-guess an appellate attorney's strategy choices. *Mayo,* 13 F.3d at 533; *see also Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1984) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the [ ] goal of vigorous and effective advocacy[.]"). However, a habeas petitioner may establish constitutionally inadequate performance if he shows that his appellate counsel omitted material and obvious issues while pursuing arguments that were

patently and significantly weaker. *Mayo,* 13 F.3d at 533.

■■■■ As part of his argument on direct appeal that the police intentionally delayed arraigning Grimes, appellate counsel emphasized that the "record unequivocally established that the Rochester Police Department already had probable cause to arrest before contacting the Houston Police Department." Petitioner's Appellate Brief at 14, App. at 25.[13] In his *coram nobis* application, Grimes pointed out that Sheridan testified that he informed Swaim that one of Grimes's co-defendants had implicated Grimes, yet Sheridan admitted falsely telling Grimes that all of his cohorts had confessed. *See* App. at 210; 10/21/94 Tr. at 21, 60. Thus, Grimes contends, there was a legal basis upon which counsel could argue that his arrest was not supported by probable cause.

The New York Court of Appeals has explained that "[p]robable cause exists when an officer has knowledge of facts and circumstances 'sufficient to support a reasonable belief that an offense has been or is being committed.'" *People v. Maldonado,* 86 N.Y.2d 631, 635, 635 N.Y.S.2d 155, 658 N.E.2d 1028 (1995) (quoting *People v. Bigelow,* 66 N.Y.2d 417, 423, 497 N.Y.S.2d 630, 488 N.E.2d 451 (1985)); *see also People v. Terry,* 2 A.D.3d 977, 768 N.Y.S.2d 516 (3d Dept.2003); C.P.L. § 140.10.[14] "Probable cause requires, not proof beyond a reasonable doubt or evidence suffi-

---

13. Citations to "App. at ___" refer to the Appendix of Exhibits submitted by respondent in connection with its answer to the present habeas petition.

14. A police officer's authority to make a warrantless arrest is set forth in C.P.L. § 140.10. Under that section a custodial arrest is authorized when the officer has "reasonable cause to believe" that an individual committed a crime, "whether in his presence or not." New York's "reasonable cause" standard is the same as the "probable cause" require-

ment of the Fourth Amendment. *See, e.g., People v. Jenkins,* 209 A.D.2d 164, 617 N.Y.S.2d 766 (1st Dept.1994). C.P.L. § 70.10(2) states that "reasonable cause" exists "when evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgement and experience that it is reasonably likely that an offense was committed and that (the suspect) committed it."

cient to warrant a conviction, but merely information which would lead a reasonable person who possesses the same expertise as the officer to conclude, under the circumstances, that a crime is being or was committed." *People v. McRay*, 51 N.Y.2d 594, 602, 435 N.Y.S.2d 679, 416 N.E.2d 1015 (1980) (citations omitted). Furthermore, "[h]earsay information supplied by an identified citizen and derived from personal knowledge enjoys a presumption of reliability and it may form the basis of probable cause." *People v. Bingham*, 263 A.D.2d 611, 612, 692 N.Y.S.2d 823 (3d Dept.1999) (citations omitted).

A review of the record below reveals that the police relied on two sworn depositions given by Jerry Brock, two sworn depositions given by David Crutcher, an oral statement by co-defendant Stubbs, and certain ballistics evidence as the bases for establishing probable cause to arrest Grimes. Crutcher's statement alleged that an individual with the street name "Retard" and the first name of "Fred" participated in discussions with McGee, Stubbs, Muldrow and Usher about the Locust Street murders and how they were going to deal with the witnesses to those shootings. According to Crutcher, "Retard" and the others talked about kidnaping the witnesses and possibly doing a "drive-by" shooting. Crutcher also told the police that at about 11:15 p.m. on December 28, 1993, "Retard" left his house with McGee, Stubbs and Muldrow. Although Crutcher did not see whether "Retard" had a gun, he saw that McGee was holding a Tech–9 rifle and Muldrow had a shotgun. After viewing a photo array, Crutcher gave a sworn statement identifying Grimes as the person whom he knew as "Retard" or "Fred." *See* App. at 64–68.

About 40 minutes after the co-defendants left Crutcher's house, Ibezime and Gross were executed at their home on Finch Street. In witness Brock's depositions to the police, he positively identified Stubbs as the person who allowed three individuals, each armed with a gun, to enter his house. In addition, on December 29, 1993, Stubbs told Sheridan that the three men they were looking for were "Ant", "Tim", and "T". At that time, Sheridan had developed information that "T" was another street name used by Grimes, and that "Ant" referred to McGee and "Tim," to Muldrow.

The ballistics evidence showed that three guns had been fired at the scene of the double homicide: a .38 caliber revolver, a MAC–11 assault rifle, and a 9–millimeter semi-automatic handgun. On December 30, 1993, a .38 caliber, a MAC–11, and a 9–millimeter were seized at Muldrow's apartment. The MAC–11, which closely resembles the Tech–9 described by Crutcher, was positively identified as being used during the shooting, as was the 9–millimeter. The .38 caliber was found to be consistent with the third gun fired during the murder.

In light of the foregoing information, it appears that there is no reasonable likelihood that an argument assailing the probable cause basis for Grimes's arrest would have been successful on appeal. Although Brock did not specifically identify Grimes as one of the perpetrators, a reasonable person reading Brock's observations in conjunction with Crutcher's statements would have linked Grimes to the double murder on Finch Street. Thus, in all likelihood, a New York court would have agreed that probable cause existed to arrest Grimes.

Because this argument probably would not have succeeded on appeal, I conclude that appellate counsel was not deficient in omitting it. Given that Grimes has failed to prove that his appellate counsel's performance was deficient—the first prong of

the test for ineffective assistance of counsel—it is unnecessary to address the second "prejudice" prong of this standard. *See Strickland v. Washington,* 466 U.S. at 694, 697, 104 S.Ct. 2052 ("[T]here is no reason for a court deciding an ineffective assistance claim to ... address both components of the inquiry if the defendant makes an insufficient showing on one."). Moreover, because the argument Grimes faults counsel for omitting on appeal is without merit, he is unable to prove prejudice as well. *See Mayo v. Henderson,* 13 F.3d at 534 ("To establish prejudice in the appellate context, a petitioner must demonstrate that there was a 'reasonable probability' that [his] claim would have been successful...." (alteration in original) (quoting *Claudio v. Scully,* 982 F.2d at 803)). Therefore, Grimes has failed to prove either that his appellate counsel provided deficient assistance, or that this performance resulted in prejudice against him.

### CONCLUSION

For the reasons stated above, Thearthur Grimes's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Grimes has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**